12-3176 (L)
Hedges v. Obama

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

-----

August Term, 2012

(Argued: February 6, 2013          Decided: July 17, 2013)

Docket Nos.  12-3176 (Lead), 12-3644 (Con)

-----

CHRISTOPHER HEDGES, DANIEL ELLSBERG, JENNIFER BOLEN, NOAM CHOMSKY, ALEXA
O'BRIEN, US DAY OF RAGE, KAI WARGALLA, HON. BIRGITTA JONSDOTTIR M.P.,

*Plaintiffs-Appellees*,

v.

BARACK OBAMA, individually and as a representative of the UNITED STATES OF AMERICA, LEON
PANETTA, individually and as a representative of the DEPARTMENT OF DEFENSE,

*Defendants-Appellants*,

JOHN MCCAIN, JOHN BOEHNER, HARRY REID, NANCY PELOSI, MITCH MCCONNELL, ERIC
CANTOR, as representatives of the UNITED STATES OF AMERICA,

*Defendants*.[*]

-----

B e f o r e :

KEARSE and LOHIER, *Circuit Judges*, and KAPLAN, *District Judge*.[**]

---

[*] The Clerk of the Court is directed to amend the official caption as shown above.

[**] The Honorable Lewis A. Kaplan, United States District Judge for the Southern District of
New York, sitting by designation.

Defendants-appellants seek review of a district court decision permanently enjoining enforcement of Section 1021(b)(2) of the 2012 National Defense Authorization Act on the ground that it violates the First and Fifth Amendments.  We conclude that Section 1021 has no bearing on the government's authority to detain the American citizen plaintiffs and that those plaintiffs therefore lack Article III standing.  Moreover, the non-citizen plaintiffs have failed to establish a sufficient basis to fear detention under the statute to give them standing to seek preenforcement review.  VACATED AND REMANDED.

ROBERT M. LOEB, Appellate Staff Civil Division, Department of Justice, Washington, DC (Stuart F. Delery, Acting Assistant Attorney General, Washington, DC; Beth S. Brinkmann, Deputy Assistant Attorney General, Washington, DC; August E. Flentje, Civil Division, Department of Justice, Washington, DC; Jeh Charles Johnson, General Counsel, Department of Defense, Washington, DC; Preet Bharara, United States Attorney for the Southern District of New York, New York, NY; Benjamin H. Torrance, Christopher B. Harwood, Assistant United States Attorneys, New York, NY, *on the brief*)
*Attorneys for Defendants-Appellants*

CARL J. MAYER, Mayer Law Group LLC, New York, NY; BRUCE I. AFRAN, ESQ., Princeton, NJ
*Attorneys for Plaintiffs-Appellees*

DAVID B. RIVKIN, JR. (Lee A. Casey, Andrew M. Grossman, *on the brief*), BakerHostetler LLP, Washington, DC
*Attorneys for Amici Curiae Senators John McCain, Lindsey Graham, and Kelly Ayotte*

Kent A. Yalowitz, Arnold & Porter LLP, New York, NY; L. Charles Landgraf, Arpan A. Sura, Arnold & Porter LLP, Washington, DC
*Attorneys for Amicus Curiae Bill of Rights Defense Committee*

Matthew J. MacLean, Pillsbury Winthrop Shaw Pittman LLP, Washington, DC
*Attorney for Amici Curiae Center for National Security Studies and The Constitution Project*

Reem Salahi, Hadsell Stormer Richardson & Renick, LLP, Pasadena, CA
*Attorney for Amicus Curiae Government Accountability Project*

Eric K. Yamamoto, University of Hawaii School of Law, Honolulu, HI; Lorraine K. Bannai, Anjana Malhotra, Seattle University School of Law, Seattle, WA
*Attorneys for Amici Curiae Karen and Ken Korematsu, et al.*

John W. Whitehead, Douglas R. McKusick, Lina M. Ragep, The Rutherford Institute, Charlottesville, VA; Anand Agneshwar, Arnold & Porter LLP, New York, NY
*Attorneys for Amicus Curiae The Rutherford Institute*

William J. Olson, Herbert W. Titus, John S. Miles, Jeremiah L. Morgan, Robert J. Olson, William J. Olson, P.C., Vienna, VA; Steven J. Harfenist, Friedman Harfenist Kraut & Perlstein LLP, Lake Success, NY; Gary G. Kreep, U.S. Justice Foundation, Ramona, CA
*Attorneys for Amici Curiae U.S. Congressman Steve Stockman, et al.*

LEWIS A. KAPLAN, *District Judge.*

On September 11, 2001, the al-Qaeda terrorist network attacked multiple targets in the United States with hijacked commercial airliners, killing approximately 3,000 people. A week later, Congress enacted the Authorization for Use of Military Force (the "AUMF"),[1] which empowered President Bush to use all necessary and appropriate force against those nations, organizations, and persons responsible for the attacks and those who harbored such organizations or persons.

Nearly twelve years later, the hostilities continue. Presidents Bush and Obama have asserted the right to place certain individuals in military detention, without trial, in furtherance of their authorized use of force. Substantial litigation has ensued over the scope of presidential military detention authority—that is, whom did Congress authorize the President to detain when it passed the AUMF?

---

[1] P.L. 107-40, 115 Stat. 224 (2001), *codified at* 50 U.S.C. § 1541 note.

On December 31, 2011, President Obama signed into law the National Defense Authorization Act for Fiscal Year 2012.[2] Section 1021 of that statute, which fits on a single page, is Congress' first—and, to date, only—foray into providing further clarity on that question. Of particular importance for our purposes, Section 1021(b)(2) appears to permit the President to detain anyone who was part of, or has substantially supported, al-Qaeda, the Taliban, or associated forces.

The controversy over Section 1021 was immediate. The government contends that Section 1021 simply reaffirms authority that the government already had under the AUMF, suggesting at times that the statute does next to nothing at all. Plaintiffs take a different view. They are journalists and activists who allegedly fear that the government may construe their work as having substantially supported al-Qaeda, the Taliban, or associated forces. They contend that Section 1021 is a dramatic expansion of the President's military detention authority, supposedly authorizing the military, for the first time, to detain American citizens on American soil. As one group of *amici* has noted, "[r]arely has a short statute been subject to more radically different interpretations than Section 1021."[3]

Plaintiffs brought this action shortly after the statute was enacted. They sought an injunction barring enforcement of Section 1021 and a declaration that it violates, among other things, their rights under the First and Fifth Amendments to the United States Constitution. The district court agreed and entered a permanent injunction restraining detention pursuant to Section 1021(b)(2). It is that decision that we review here.

---

[2] P.L. 112-81, 125 Stat. 1298 (2011) ("2012 NDAA").

[3] Stockman Amici Br. 3.

We conclude that plaintiffs lack standing to seek preenforcement review of Section 1021 and vacate the permanent injunction. The American citizen plaintiffs lack standing because Section 1021 says nothing at all about the President's authority to detain American citizens. And while Section 1021 does have a real bearing on those who are neither citizens nor lawful resident aliens *and* who are apprehended abroad, the non-citizen plaintiffs also have failed to establish standing because they have not shown a sufficient threat that the government will detain them under Section 1021. Accordingly, we do not address the merits of plaintiffs' constitutional claims.

## I. *Background*

Prior to the passage of Section 1021, a number of federal judges reached divergent conclusions about the scope of AUMF detention authority. To appreciate what Congress did and did not resolve in passing Section 1021, one must understand the nature of this debate. We thus describe the history of the litigation over AUMF detention authority in some detail.

### A. *The AUMF*

The AUMF, enacted on September 18, 2001, provides:

"[T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons."[4]

President Bush ordered the United States military to Afghanistan to subdue al-Qaeda and the Taliban

---

[4] AUMF § 2(a).

regime known to support it. Soon thereafter, President Bush began to hold certain individuals in military detention as "enemy combatants," many of them at the United States Naval Base in Guantánamo Bay, Cuba.[5]

B.      *The Citizen and Domestic Capture Cases: Hamdi, Padilla, and al-Marri*

As one scholar has noted, the litigation regarding the scope of executive detention authority may be divided into two "waves": (1) litigation from 2002 to 2008 regarding three individuals who were held as enemy combatants in military detention within the territorial United States, and (2) litigation from 2008 to the present concerning Guantánamo detainees.[6] The first category comprises the cases of Yaser Esam Hamdi, Jose Padilla, and Ali Saleh Kahlah al-Marri.

1.      *Hamdi*

Hamdi, then an American citizen, was in Afghanistan in the fall of 2001, where he allegedly was armed and affiliated with a Taliban military unit that had provided him weapons

---

[5]

*See* Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57,833 (Nov. 13, 2001) (military order asserting authority, under AUMF and Article II of United States Constitution, to detain and try by military tribunal non-citizens who, there was reason to believe, were members of al-Qaeda, had been involved in preparing terrorist attacks directed against United States interests, or had harbored individuals who had done so); *see generally Gherebi v. Obama*, 609 F. Supp.2d 43, 46–47 (D.D.C. 2009); *Rasul v. Bush*, 542 U.S. 466, 471 (2004) (discussing the military detention of over six hundred non-citizens at Guantánamo).

[6]

*See* Robert M. Chesney, *Who May Be Held? Military Detention Through the Habeas Lens*, 52 B.C. L. Rev. 769, 805 (2011).

training.[7]  He was apprehended when that unit surrendered after a battle.[8]  After entering military detention within the United States, a habeas corpus petition was filed on his behalf, alleging *inter alia* that his detention violated the Non-Detention Act of 1971, which provides, "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress."[9]

Although the Supreme Court in June 2004 remanded Hamdi's case to allow him to challenge his status as an enemy combatant, it upheld the government's authority to detain a properly designated enemy combatant in *Hamdi v. Rumsfeld*,[10] when "five Members of the Court recognized that detention of individuals who fought against the United States in Afghanistan 'for the duration of the particular conflict in which they were captured, is so fundamental and accepted an incident to war as to be an exercise of the "necessary and appropriate force" Congress has authorized the President to use'" by the AUMF.[11]

In so doing, a four Justice plurality[12] noted that "[t]he legal category of enemy combatant has not been elaborated upon in great detail" and that "[t]he permissible bounds of the

---

[7]  *Hamdi v. Rumsfeld*, 542 U.S. 507, 513 (2004) (plurality opinion).

[8]  *Id.*

[9]  18 U.S.C. § 4001(a).

[10]  542 U.S. 507.

[11]  *Boumediene v. Bush*, 553 U.S. 723, 733 (2008) (discussing *Hamdi*).

[12]  Justice O'Connor, joined by Chief Justice Rehnquist, Justice Kennedy, and Justice Breyer.

category will be defined by the lower courts as subsequent cases are presented to them."[13] It nevertheless concluded that the AUMF "clearly and unmistakably" authorized detaining at least those who were "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there."[14] Thus, the plurality reasoned that, if the government's allegations were correct, Hamdi's detention did not violate the Non-Detention Act because the AUMF itself constituted the requisite "Act of Congress."[15] To the extent Hamdi identified constitutional concerns with the military detention of American citizens generally, the plurality concluded that there was "no bar to this Nation's holding one of its own citizens as an enemy combatant."[16] Nevertheless, the plurality suggested that this detention authority was not boundless and that detention pursuant to it could not be indefinite. Rather, "based on longstanding law-of-war principles," the plurality construed the AUMF "to include the authority to detain for the duration of the relevant conflict."[17] Justice Thomas wrote separately and provided a fifth vote for upholding authority to detain Hamdi under the AUMF, but rejected any limitations, derived from the laws of war, on the duration of the detention authority.[18]

---

[13] *Hamdi*, 542 U.S. at 522 n.1 (plurality opinion).

[14] *Id.* at 516, 519 (internal quotation marks omitted).

[15] *Id.* at 517. The plurality did not reach the alternative argument that the President's Article II powers as Commander-in-Chief authorized the detention. *Id.* at 516–17.

[16] *Id.* at 519 (citing *Ex Parte Quirin*, 317 U.S. 1, 37–38 (1942)).

[17] *Id.* at 521.

[18] *Id.* at 587–88 (Thomas, J., dissenting).

The four remaining Justices dissented from the conclusion that Hamdi could be detained, reasoning *inter alia* that the AUMF did not constitute sufficiently clear authorization of his detention to satisfy the Non-Detention Act.[19]  Justice Scalia, joined by Justice Stevens, would have held further that the government was without constitutional power to detain Hamdi militarily absent congressional suspension of the writ of habeas corpus.[20]

### 2.    *Padilla*

Padilla, also an American citizen, was apprehended at Chicago's O'Hare International Airport in May 2002 after allegedly receiving training from al-Qaeda in Afghanistan, becoming involved in a plan to detonate a "dirty bomb" here, and returning to the United States to conduct reconnaissance and facilitate attacks by al-Qaeda.[21]

In December 2003—prior to *Hamdi*—this Court held that because Padilla was an American citizen arrested on domestic soil away from a zone of combat, his military detention violated the Non-Detention Act and could not be justified by the President's Article II war powers.[22] The Supreme Court reversed our decision on procedural grounds on the day it decided *Hamdi* but

---

[19] *Id.* at 547–51 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) (reasoning further that while AUMF might provide clear authority to detain Hamdi in accordance with laws of war, government was not doing so); *id.* at 574 (Scalia, J., dissenting).

[20] *Id.* at 571–75 (Scalia, J., dissenting) (citing *Ex Parte Milligan*, 71 U.S. 2, 4 Wall. 2 (1866)).

[21] *Padilla v. Rumsfeld*, 352 F.3d 695, 699–701 (2d Cir. 2003), *rev'd on jurisdictional grounds*, 542 U.S. 426 (2004).

[22] *Id.* at 712, 722.

did not reach the lawfulness of Padilla's detention.[23]

Following the Supreme Court's reversal of our *Padilla* ruling, a new habeas petition was filed on his behalf. The Fourth Circuit in 2005 concluded that Padilla was lawfully detained under the reasoning of *Hamdi* because it became known that he had been "armed and present in a combat zone during armed conflict between al Qaeda/Taliban forces and the armed forces of the United States" while in Afghanistan prior to his return to the United States.[24] Although Padilla had been apprehended in the United States, the Fourth Circuit concluded that *Hamdi* had not relied on the place of capture.[25] The government subsequently indicted Padilla and transferred him to civilian criminal custody. His petition for certiorari was denied.[26]

### 3. *Al-Marri*

The Fourth Circuit again considered the scope of military detention authority in the case of al-Marri, a Qatari national apprehended in the United States while he was lawfully residing here.[27] Al-Marri allegedly was a "sleeper agent" who had met Osama Bin Laden, was trained by al-

---

[23] *Rumsfeld v. Padilla*, 542 U.S. 426, 430 (2004). Justice Stevens (joined by Justices Souter, Ginsburg, and Breyer) dissented and indicated that he would have held, consistent with our decision, that Padilla's detention violated the Non-Detention Act. *Id.* at 464 n.8.

[24] *Padilla v. Hanft*, 423 F.3d 386, 390 (4th Cir. 2005) (internal quotation marks omitted).

[25] *Id.* at 393–94.

[26] *Padilla v. Hanft*, 547 U.S. 1062 (2006).

[27] *Al-Marri v. Wright*, 487 F.3d 160, 164, 171 (4th Cir. 2007), *rev'd sub nom. Al-Marri v. Pucciarelli*, 534 F.3d 213 (4th Cir. 2008) (*en banc*) (*per curiam*), *vacated sub nom. Al-Marri v. Spagone*, 555 U.S. 1220 (2009).

Qaeda, and had been sent to the United States to facilitate terrorist activities here.[28] Unlike Padilla and Hamdi, however, the government did not allege that al-Marri had stood alongside armed forces hostile to the United States or had been present in a combat zone during hostilities.[29]

A splintered *en banc* Fourth Circuit concluded in July 2008 that the executive had authority to detain al-Marri as an enemy combatant, assuming that the government's allegations were true.[30] While each offered a different definition of those subject to detention, the three principal opinions which voted in favor of this general proposition gave significant weight to the fact that, if the government's allegations were correct, al-Marri was little different from the 9/11 hijackers themselves, short of succeeding in the plot.[31] The judges who took the contrary view concluded that al-Marri was a civilian and therefore could not properly be detained militarily under

---

[28]

*Id.* at 165–66.

[29]

*Id.* at 183.

[30]

*Al-Marri*, 534 F.3d at 216.

[31]

*See id.* at 259–60 (Traxler, J., concurring in the judgment); *id.* at 287 (Williams, C.J., concurring in part and dissenting in part); *id.* at 297 (Wilkinson, J., concurring in part and dissenting in part).

Judge Wilkinson proposed that the AUMF authorized detaining those who are (1) an "enemy," as a member of an organization against whom Congress has authorized the use of military force, and (2) a "combatant," as someone who knowingly acts to inflict harm in order to further the military goals of that organization. *Id.* at 323–24.

Judge Williams focused instead on those who (1) "attempt[] or engage[] in belligerent acts against the United States, either domestically or in a foreign combat zone; (2) on behalf of an enemy force." *Id.* at 285.

traditional principles of the laws of war.[32] The key question for them was whether he had affiliated "with the military arm of an enemy *nation*."[33]

The Supreme Court granted certiorari,[34] but then vacated the decision below as moot when the newly elected Obama administration indicted al-Marri and sought to transfer him to civilian criminal custody.[35]

## C.    *The Guantánamo Cases*

Meanwhile, Congress and the courts were engaging in a dialogue over a more basic question regarding the Guantánamo detainees—whether they had any right to petition for habeas corpus at all.[36] This culminated in June 2008 with *Boumediene v. Bush*, which held that the Guantánamo detainees had constitutional habeas rights and that the procedures that Congress and

---

[32]
> *See generally id.* at 230–31 (Motz, J., concurring in the judgment); *but see id.* at 314–22 (Wilkinson, J., concurring in part and dissenting in part) (concluding that law-of-war principles must account for recent developments in how warfare is conducted).

[33]
> *Id.* at 231 (emphasis added).

[34]
> *Al-Marri v. Pucciarelli*, 555 U.S. 1066 (2008).

[35]
> *Al-Marri v. Spagone*, 555 U.S. 1220.

[36]
> *See Rasul*, 542 U.S. at 484 (holding that statutory habeas jurisdiction extended to Guantánamo); Detainee Treatment Act of 2005, P.L. 109-148, 119 Stat. 2680, Title X ("DTA"), § 1005(e)(1) (purporting to strip statutory habeas jurisdiction for Guantánamo detainees); *Hamdan v. Rumsfeld*, 548 U.S. 557, 584 (2006) (concluding that Section 1005(e)(1) of the DTA did not apply to pending cases); Military Commissions Act of 2006, P.L. 109-366, 120 Stat. 2600 ("2006 MCA"), § 7 (stripping habeas jurisdiction from future and pending cases); *Boumediene*, 553 U.S. at 792 (concluding that Section 7 of the 2006 MCA is unconstitutional).

the administration had provided were not an adequate substitute.[37]

### 1.    *Activity Pre-*Boumediene

In July 2004, shortly after *Hamdi*, the government created Combatant Status Review Tribunals ("CSRTs") to determine whether the Guantánamo detainees were enemy combatants, which the Department of Defense then defined to mean "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."[38]

Congress did not endorse this definition or otherwise speak directly to the scope of detention authority during this period.  It codified the CSRT process in the Detainee Treatment Act of 2005, but that statute did not explain who could be detained.[39]  The Military Commissions Act of 2006 defined the concept of an "unlawful enemy combatant," but only with respect to eligibility for trial by the military commissions created by that act, not to AUMF detention authority.[40]

---

[37]

553 U.S. at 771, 792.

[38]

Memorandum from Deputy Secretary of Defense Paul Wolfowitz re: Order Establishing Combatant Status Review Tribunal § a (July 7, 2004), *available at* http://www.defense.gov/news/Jul2004/d20040707review.pdf; *see Hamdan*, 548 U.S. at 571 n.1 (citing this definition).

[39]

*See* DTA § 1005(e)(2)(C)(ii) (requiring only that D.C. Circuit ensure that Department of Defense's chosen CSRT standards comply with Constitution and federal law, as applicable).

[40]

*See* 2006 MCA § 3(a) (defining such individuals to include, *inter alia*, anyone who has "engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al-Qaeda, or associated forces)"); *see also* Military

### 2. *Judicial Consideration post-*Boumediene

Absent clarity from Congress, *Boumediene* opened the gates to judicial evaluation of the scope of executive detention authority for Guantánamo detainees. On remand from the Supreme Court, Judge Leon of the D.C. district court in the fall of 2008 declined to follow any of the approaches set forth in *Al-Marri* and instead adopted the government's prior 2004 CSRT definition, concluding that it was consistent with the AUMF and the Constitution.[41]

### a. *March 2009 Memo*

On March 13, 2009, the new administration, in a memorandum to the D.C. district court (the "March 2009 Memo" or the "Memo"),[42] "refin[ed]" the government's position regarding its detention authority for "those persons who are now being held at Guantánamo Bay."[43] Relying on the *Hamdi* plurality opinion, the Memo asserted that the scope of executive detention authority "is necessarily informed by principles of the laws of war," as these principles "inform the

---

Commissions Act of 2009 ("2009 MCA"), P.L. 111-84, 123 Stat. 2190, Title XVIII, § 1802 (revising 2006 MCA definition somewhat and renaming the relevant term "unprivileged enemy belligerent"); *cf. Al-Marri*, 534 F.3d at 328 n.9 (Wilkinson, J., concurring in part and dissenting in part) (observing that 2006 MCA definition was "of limited assistance and relevance" as it does "not specifically address the scope of the President's detention power under the AUMF").

[41]

*Boumediene v. Bush*, 583 F. Supp.2d 133, 134–35 (D.D.C. 2008).

[42]

Respondents' Memorandum Regarding the Government's Detention Authority Relative to Detainees Held at Guantanamo Bay, *In re Guantanamo Bay Detainee Litigation*, Misc. No. 08-442 (TFH) (D.D.C. Mar 13, 2009).

[43]

The March 2009 Memo made clear that the position set forth "is limited to the authority upon which the Government is relying to detain the persons now being held at Guantanamo Bay" and is "not, at this point, meant to define the contours of authority for military operations generally, or detention in other contexts." *Id.* at 2.

understanding of what is 'necessary and appropriate'" under the AUMF.[44] With this predicate, the Memo declared that the government, in addition to being able to detain individuals themselves responsible for the attacks, had the authority

> "to detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces."[45]

It stated further that "[i]t is neither possible nor advisable" to identify what these terms mean in the abstract.[46] Nevertheless, the March 2009 Memo said that the inquiry with regard to whether an individual is "part of" the enumerated forces may depend on either "a formal or functional analysis of the individual's role."[47] With regard to "associated forces," it observed that "many different private armed groups" fought alongside al-Qaeda and the Taliban in Afghanistan and therefore declared the authority to detain individuals who "in analogous circumstances in a traditional international armed conflict . . . would be detainable under principles of co-belligerency."[48] Finally, it said that the term "substantial support" does not justify detaining "those who provide unwitting

---

[44] *Id.* at 1, 3. The Memo recognized that the laws of war were "less well-codified with respect to our current, novel type of armed conflict against armed groups such as al-Qaida and the Taliban." *Id.* at 1. Accordingly, it asserted that principles from traditional "international armed conflicts between the armed forces of nation states" must inform the AUMF authority. *Id.*

[45] *Id.* at 2. The Memo no longer used the term "enemy combatant."

[46] *Id.*

[47] *Id.* at 6.

[48] *Id.* at 7.

or insignificant support" to the identified organizations.[49] But, "[u]nder a functional analysis, individuals who provide substantial support to al-Qaida forces in other parts of the world may properly be deemed part of al-Qaida itself."[50] Moreover, "[s]uch activities may also constitute the type of substantial support that, in analogous circumstances in a traditional international armed conflict, is sufficient to justify detention."[51] In any event, the March 2009 Memo took the view that "the AUMF is not limited to persons captured on the battlefields of Afghanistan" nor to those "directly participating in hostilities."[52]

### b. District Court Reaction

District of Columbia district court reactions to the March 2009 Memo were mixed. Judges uniformly accepted the government's "part of" test but expressed considerable skepticism about "substantial support."[53] One opinion adopted the government's position, but only by reading "substantial support" narrowly to permit detention of those "effectively part of the armed forces of

---

[49] *Id.* at 2.

[50] *Id.* at 7.

[51] *Id.* (citing *Boumediene v. Bush*, 579 F. Supp.2d 191, 198 (D.D.C. 2008) (finding petitioner properly detained under "support" prong of adopted 2004 CSRT definition)).

[52] *Id.* at 7, 8 (internal quotation marks omitted).

[53] Even judges otherwise supportive of the government's position previously had not been unanimous that being part of al-Qaeda was enough. *See Al-Marri*, 534 F.3d at 325 (Wilkinson, J., concurring in part and dissenting in part) (opining that "membership, without more" is insufficient).

the enemy."[54]  In what became the majority view in the D.C. district court, another went one step further and rejected the government's reliance on "substantial support" and "directly support[ing] hostilities" altogether, concluding that detention on such grounds was unsupported either by domestic law or the laws of war.[55]

### c.    Al-Bihani

These decisions set the stage for the D.C. Circuit's central ruling on the scope of AUMF detention authority, *Al-Bihani v. Obama*.[56]  Petitioner Al-Bihani carried a weapon and was a cook for a unit that fought alongside the Taliban.[57]  He contended that his detention was inconsistent with the laws of war and thus not authorized as "necessary and appropriate" under the AUMF.[58]  The majority opinion rejected the notion that the laws of war limit the government's

---

[54] *Gherebi*, 609 F. Supp.2d at 69 (Walton, J.) (internal quotation marks and alterations omitted); *accord Mohammed v. Obama*, 704 F. Supp.2d 1, 4 (D.D.C. 2009) (Kessler, J.).

[55] *Hamlily v. Obama*, 616 F. Supp.2d 63, 75–77 (D.D.C. 2009) (Bates, J.) (internal quotation marks omitted); *accord Mattan v. Obama*, 618 F. Supp.2d 24, 26 (D.D.C. 2009) (Lamberth, C. J.); *Anam*, 653 F. Supp.2d 62, 64 (D.D.C. 2009) (Hogan, J.); *Al Mutairi v. United States*, 644 F. Supp.2d 78, 85 (D.D.C. 2009) (Kollar-Kotelly, J.); *Hatim v. Obama*, 677 F. Supp.2d 1, 7 (D.D.C. 2009) (Urbina, J.), *vacated sub nom. Hatim v. Gates*, 632 F.3d 720 (D.C. Cir. 2011); *Awad v. Obama*, 646 F. Supp.2d 20, 23 (D.D.C. 2009) (Robertson, J.).

[56] 590 F.3d 866 (D.C. Cir. 2010).

[57] *Id.* at 869.

[58] *Id.* at 870–71.

AUMF authority at all—even though the government agreed with Al-Bihani on that point.[59] Taking the view that the "the government's detention authority logically covers a category of persons no narrower than is covered by its military commission authority," the majority concluded that Al-Bihani was properly detained because he fell within the latter standard, which Congress had set forth in the Military Commissions Acts of 2006 and 2009.[60] That is, the majority held that AUMF detention authority "includes those who are part of forces associated with Al Qaeda or the Taliban or those who purposefully and materially support such forces in hostilities against U.S. Coalition partners."[61]

While focusing on this "purposeful and material support" standard, the majority's discussion seemed generally supportive of the government's "substantial support" standard as well. The majority stated that Al-Bihani was detained lawfully under either the CSRT definition or the

---

[59]

*Id.* at 871 ("There is no indication . . . that Congress intended the international laws of war to act as extra-textual limiting principles for the President's war powers under the AUMF."); *see id.* at 885 (Williams, J., concurring in part and concurring in the judgment) (observing that majority's discussion on this point "goes well beyond what even the *government* has argued in this case" (emphasis in original)); *Al-Bihani v. Obama*, 619 F.3d 1, 1 (D.C. Cir. 2010) (opinion by all active judges except those on *Al-Bihani* panel denying *en banc* review but noting that panel's discussion of laws of war was "not necessary to the disposition of the merits").

[60]

*Al-Bihani*, 590 F.3d at 872; *but see* Stephen I. Vladeck, *The D.C. Circuit After* Boumediene, 41 SETON HALL L. REV. 1451, 1460 (2011) (questioning this logical step); Oona Hathaway, Samuel Adelsberg, Spencer Amdur, Philip Levitz, Freya Pitts & Sirine Shebaya, *The Power to Detain: Detention of Terrorism Suspects After 9/11*, 38 YALE J. INT'L L. 123, 143–44 (2013) (similar); Sophia Brill, Comment, *The National Security Court We Already Have*, 28 YALE L. & POL'Y REV. 525, 533 n.42 (2010) (similar); H.R. Rep. No. 111-288, at 862–63 (2009) (2009 MCA committee report indicating that definition "is not intended to address the scope of the authority of the United States to detain individuals in accordance with the laws of war").

[61]

590 F.3d at 872 (citing 2006 and 2009 MCAs).

government's modified "substantial support" definition.[62]  Moreover, it later noted that Al-Bihani "both [was] part of and [had] substantially supported enemy forces" and, without exploring the bounds of these concepts, "recognize[d] that both prongs are valid criteria that are independently sufficient to satisfy the [detention] standard."[63]

### d.        Subsequent D.C. Circuit Case Law

Further decisions by the D.C. Circuit followed the principle that the AUMF authorized detention not only of those who are "part of" al-Qaeda and the Taliban but also those who "purposefully and materially support" such forces.[64]  Notably, however, the D.C. Circuit has not had occasion to develop further the contours of the "support" prong, apparently because the government appears rarely to rely on it.  Rather, in numerous cases before the D.C. Circuit since *Al-Bihani*, the government has relied on a theory that the detainee was "part of" al-Qaeda, the Taliban, or

---

[62] *Id.*

[63] *Id.* at 873–74.

[64] *See Hatim*, 632 F.3d at 721 (vacating grant of habeas because district court did not consider whether petitioner had "purposefully and materially supported" enemy forces); *see also Gul v. Obama*, 652 F.3d 12, 19 (D.C. Cir. 2011) (reading *Al-Bihani* to set forth "purposeful and material support" standard); *Almerfedi v. Obama*, 654 F.3d 1, 3 n.2 (D.C. Cir. 2011) (same); *Al-Madhwani v. Obama*, 642 F.3d 1071, 1073–74 (D.C. Cir. 2011) (same); *Uthman v. Obama*, 637 F.3d 400, 402 n.2 (D.C. Cir. 2011) (same); *Salahi v. Obama*, 625 F.3d 745, 747 (D.C. Cir. 2010) (same).

On the other hand, the D.C. Circuit does not appear to have read *Al-Bihani* as adopting a "substantial support" standard.  *But see Al Alwi v. Obama*, 653 F.3d 11, 15–16 (D.C. Cir. 2011) (citing to "substantial support" standard where detainee expressly did not challenge its lawfulness); *Barhoumi v. Obama*, 609 F.3d 416, 423 (D.C. Cir. 2010) (same).

associated forces.[65] In fact, in *Bensayah v. Obama*,[66] a case argued before but decided after *Al-Bihani*, the government specifically foreswore reliance on any support justification for detention.[67] It did so despite the facts that (1) support was the sole ground on which the district court had relied in finding Bensayah detainable, and (2) the March 2009 Memo had cited that district court decision as its one example of when "substantial support" might apply.[68] Moreover, the government dropped reliance on a "purposeful and material support" theory in *Salahi v. Obama*.[69]

---

[65]

> *See, e.g.*, *Awad v. Obama*, 608 F.3d 1, 9 (D.C. Cir. 2010); *Al-Adahi v. Obama*, 613 F.3d 1102, 1106 (D.C. Cir. 2010); *Barhoumi*, 609 F.3d at 425; *Al Odah v. Obama*, 611 F.3d 8, 17 (D.C. Cir. 2010); *Uthman*, 637 F.3d at 402; *Khan v. Obama*, 655 F.3d 20, 33 (D.C. Cir. 2011); *Al Alwi*, 653 F.3d at 17; *Esmail v. Obama*, 639 F.3d 1075, 1076 (D.C. Cir. 2011); *Suleiman v. Obama*, 670 F.3d 1311, 1313 (D.C. Cir. 2012); *Khairkhwa v. Obama*, 703 F.3d 547, 550 (D.C. Cir. 2012).

> This may be explained by the "functional rather than . . . formal" approach the D.C. Circuit has taken with the "part of" inquiry, which focuses "upon the actions of the individual in relation to the organization" to determine whether "a particular individual was sufficiently involved with the organization to be deemed part of it." *Salahi*, 625 F.3d at 751–52 (internal quotation marks and alterations omitted).

[66]

> 610 F.3d 718 (D.C. Cir. 2010).

[67]

> *Id.* at 722 (noting that government has "abandoned its argument that Bensayah is being detained lawfully because of the support he rendered to al Qaeda"); *cf.* Charlie Savage, *Obama Team Is Divided on Anti-Terror Tactics*, N.Y. TIMES, Mar. 29, 2010, at A1 (reporting on internal dissension within Obama administration regarding whether government should argue that support justified Bensayah's detention).

[68]

> *See Bensayah*, 610 F.3d at 722; March 2009 Memo at 7.

[69]

> 625 F.3d at 747.

*D.*     *The 2012 NDAA*

It was in this context that the 2012 NDAA was enacted on December 31, 2011.

Section 1021 of that statute provides in relevant part:

"SEC. 1021. AFFIRMATION OF AUTHORITY OF THE ARMED FORCES OF THE UNITED STATES TO DETAIN COVERED PERSONS PURSUANT TO THE AUTHORIZATION FOR USE OF MILITARY FORCE.

(a) In General.-- Congress affirms that the authority of the President to use all necessary and appropriate force pursuant to the Authorization for Use of Military Force (Public Law 107-40; 50 U.S.C. 1541 note) includes the authority for the Armed Forces of the United States to detain covered persons (as defined in subsection (b)) pending disposition under the law of war.

(b) Covered Persons.-- A covered person under this section is any person as follows:

(1) A person who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored those responsible for those attacks.

(2) A person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces.

(c) Disposition Under Law of War.-- The disposition of a person under the law of war as described in subsection (a) may include the following:

(1) Detention under the law of war without trial until the end of the hostilities authorized by the Authorization for Use of Military Force.

(2) Trial under chapter 47A of title 10, United States Code (as amended by the Military Commissions Act of 2009 (title XVIII of Public Law 111-84)).

(3) Transfer for trial by an alternative court or competent tribunal having lawful jurisdiction.

(4) Transfer to the custody or control of the person's country of origin, any other foreign country, or any other foreign entity.

(d) Construction.-- Nothing in this section is intended to limit or expand the authority of the President or the scope of the Authorization for Use of Military Force.

(e) Authorities.-- Nothing in this section shall be construed to affect existing law or authorities relating to the detention of United States citizens, lawful resident aliens of the United States, or any other persons who are captured or arrested in the United States."[70]

But it is useful to set out the history of this provision, as it may shed light on its proper construction.

An initial version of this section was reported by the House Armed Services Committee in May 2011.[71] It affirmed that the United States "is engaged in an armed conflict with al-Qaeda, the Taliban, and associated forces" and that the President has the authority to use force against those who (A) are "part of, or are substantially supporting, al-Qaeda, the Taliban, or associated forces" or (B) "have engaged in hostilities or have directly supported hostilities in aid of a nation, organization, or person described in subparagraph (A)."[72] Such use of force, the bill provided, includes the power to detain such persons until the termination of hostilities.[73] The committee report stated the following about the provision:

> "The committee notes that as the United States nears the tenth anniversary of the attacks on September 11, 2001, the terrorist threat has evolved as a result of intense military and diplomatic pressure from the United States and its coalition partners. However, Al Qaeda, the Taliban, and associated forces still pose a grave threat to U.S. national security. The [AUMF] necessarily includes the authority to address the continuing and evolving threat posed by these groups.

---

[70]

2012 NDAA § 1021.

[71]

H.R. 1540, 112th Cong. § 1034 (as reported by H. Comm. on Armed Services, May 17, 2011), *available at* http://www.gpo.gov/fdsys/pkg/BILLS-112hr1540rh/pdf/BILLS-112hr1540rh.pdf.

[72]

*Id.*

[73]

*Id.*

"The committee supports the Executive Branch's interpretation of the [AUMF], as it was described in [the March 2009 Memo]. While this affirmation is not intended to limit or alter the President's existing authority pursuant to the [AUMF], the Executive Branch's March 13, 2009, interpretation remains consistent with the scope of the authorities provided by Congress."[74]

The Senate Armed Services Committee developed a different version of this section, Section 1031 of S. 1253, which was reported out of committee on June 22, 2011.[75] Subsections (a)-(c) of that section were similar to subsections (a)-(c) of the later enacted Section 1021.[76] Section 1031 of S. 1253, however, included a "limitation" stating that the detention authority "does not extend to the detention of citizens or lawful resident aliens of the United States on the basis of conduct taking place within the United States except to the extent permitted by the Constitution."[77] The committee report stated:

"[Section 1031] would authorize the [military] to detain unprivileged enemy belligerents captured in the course of hostilities authorized by the [AUMF].

---

[74]

H.R. Rep. 112-78 at 209 (2011), *available at* http://www.gpo.gov/fdsys/pkg/CRPT-112hrpt78/pdf/CRPT-112hrpt78.pdf.

[75]

S. 1253, 112th Cong. § 1031 (as reported by S. Comm. on Armed Services, June 22, 2011), *available at* http://www.gpo.gov/fdsys/pkg/BILLS-112s1253rs/pdf/BILLS-112s1253rs.pdf.

Section 1031 was one of a number of sections in a subtitle entitled "Detainee Matters" in this bill. The subtitle included also Section 1032, which mandated military detention of non-citizen members of al-Qaeda who participated in planning or carrying out an attack against the United States, subject to a national security waiver.

[76]

*Id.* There were some differences, however. The original Section 1031(a) did not use the word "affirms" as did the eventual Section 1021(a). Moreover, this version described those detainable as "unprivileged enemy belligerents" and limited detention to those "captured in the course of hostilities," both terms that were subsequently removed. *Compare id.* § 1031(a) *with* 2012 NDAA § 1021(a).

[77]

*Id.*

"The committee recognizes that the [military] do[es] not need specific statutory authorization to detain enemy belligerents under the law of war when they are captured in the course of any lawful armed conflict. Because the long-term nature of the current conflict has led to the detention of a number of individuals for a period that is not likely to end soon, the committee concludes that such statutory authorization is appropriate in this case."[78]

The detainee sections of S. 1253, including but not limited to Section 1031, encountered some opposition from senators and the administration.[79] After various consultations, the Senate Armed Services Committee reported a revised version on November 15, 2011, as S. 1867. Section 1031(a)–(d) of S. 1867 was identical to the ultimately enacted Section 1021(a)–(d).[80] In particular, S. 1867 removed the limitation regarding detention of citizens and lawful resident aliens based on domestic conduct. It also added a provision stating, "Nothing in this section is intended to limit or expand the authority of the President or the scope of the [AUMF]."[81] On November 17, the administration issued a Statement of Administration Policy which stated that Section 1031 was unnecessary because the authority it attempted to codify already existed and expressed concern about potential unintended consequences from legislative action in this area.[82]

---

[78]

S. Rep. 112-26 at 176 (2011), *available at* http://www.gpo.gov/fdsys/pkg/CRPT-112srpt26/pdf/CRPT-112srpt26.pdf.

[79]

*See* Letter from Sen. Harry Reid to Sen. Carl Levin and Sen. John McCain (Oct. 4, 2011) (stating that Sen. Reid would not bring bill to floor until concerns were resolved), *reprinted in* 157 Cong. Rec. S6,323-03, S6,324 (daily ed. Oct. 6, 2011).

[80]

S. 1867, 112th Cong. § 1031 (as reported by S. Comm. on Armed Services, Nov. 15, 2011), *available at* http://www.gpo.gov/fdsys/pkg/BILLS-112s1867pcs/pdf/BILLS-112s1867pcs.pdf.

[81]

*Id.* § 1031(d).

[82]

*See* Executive Office of the President, Statement of Administration Policy, S. 1867 – National Defense Authorization Act for FY 2012 (Nov. 17, 2011), *reprinted in* 157 Cong.

In ensuing floor debates, a number of senators raised concerns that Section 1031 provided new authority to the President to detain American citizens indefinitely, with particular concern about citizens captured domestically.[83] Senator Dianne Feinstein unsuccessfully proposed an amendment that would have provided: "The authority described in this section for the [military] to detain a person does not include the authority to detain a citizen of the United States without trial until the end of the hostilities."[84]

Senator Feinstein prevailed in putting forth a second proposal, however, a so-called "compromise amendment"[85] that ultimately became Section 1021(e) and read, as enacted: "Nothing in this section shall be construed to affect existing law or authorities relating to the detention of United States citizens, lawful resident aliens of the United States, or any other persons who are

---

Rec. S7,943-01, S7,952 (daily ed. Nov. 29, 2011).

[83]

*See, e.g.*, 157 Cong. Rec. S7,941-01, S7,941 (daily ed. Nov. 29, 2011) ("We are talking about American citizens who could be taken from the United States and sent to a camp at Guantanamo Bay and held indefinitely.") (statement of Sen. Paul); 157 Cong. Rec. S7,943-01, S7,945 (daily ed. Nov. 29, 2011) ("The provisions authorize the indefinite military detention of American citizens who are suspected of involvement in terrorism—even those captured here in our own country . . . .") (statement of Sen. Udall); *id.* at S7,949 ("[Section 1031] will, for the first time in the history of the United States of America, authorize the indefinite detention of American citizens in the United States.") (statement of Sen. Durbin); *id.* at S7,950 ("I am . . . very concerned about the notion of the protection of our own citizens and our legal residents from military action inside our own country.") (statement of Sen. Webb); *id.* at S7,953 ("As currently written, the language in this bill would authorize the military to indefinitely detain individuals—including U.S. citizens—without charge or trial. I am fundamentally opposed to indefinite detention, and certainly when the detainee is a U.S. citizen held without charge.") (statement of Sen. Leahy); 157 Cong. Rec. S7,956-02, S7,961 (daily ed. Nov. 29, 2011) ("Section 1031 runs the risk of authorizing the indefinite detention without trial of Americans.") (statement of Sen. Franken).

[84]

*See* 157 Cong. Rec. S7,716-01, S7,745 (daily ed. Nov. 17, 2011); 157 Cong. Rec. S8,094-03, S8,125 (daily ed. Dec. 1, 2011).

[85]

*Id.* at S8,122.

captured or arrested in the United States."[86]  In advancing this proposal, Senator Feinstein observed

that the dispute over Section 1031 boiled down to "different interpretations of what the current law

is."[87]  Specifically, she noted that

> "[t]he sponsors of the bill believe that current law authorizes the detention of U.S. citizens arrested within the United States, without trial, until 'the end of the hostilities' which, in my view, is indefinitely.
>
> "Others of us believe that current law, including the Non-Detention Act that was enacted in 1971, does not authorize such indefinite detention of U.S. citizens arrested domestically. The sponsors believe that the Supreme Court's *Hamdi* case supports their position, while others of us believe that *Hamdi*, by the plurality opinion's express terms, was limited to the circumstance of U.S. citizens arrested on the battlefield in Afghanistan, and does not extend to U.S. citizens arrested domestically. And our concern was that section 1031 of the bill as originally drafted could be interpreted as endorsing the broader interpretation of *Hamdi* and other authorities."[88]

Senator Feinstein went on to state that, through her second proposed amendment, the two camps

would agree to disagree:

> "So our purpose in the second amendment, number 1456, is essentially to declare a truce, to provide that section 1031 of this bill does not change existing law, whichever side's view is the correct one. So the sponsors can read *Hamdi* and other authorities broadly, and opponents can read it more narrowly, and this bill does not endorse either side's interpretation, but leaves it to the courts to decide."[89]

Senator Carl Levin, a principal sponsor of the bill and opponent of Senator Feinstein's first proposed

amendment, supported her second proposal, stating:

---

[86] 2012 NDAA § 1021(e); *see* 157 Cong. Rec. S8,157-02, S8,157 (daily ed. Dec 1, 2011).

[87] 157 Cong Rec. S8,094-03, S8,122 (daily ed. Dec. 1, 2011) (statement of Sen. Feinstein).

[88] *Id.* (case name italics added).

[89] *Id.* (case name italics added).

"[I]t would provide the assurance that we are not adversely affecting the rights of the U.S. citizens in this language. . . . It makes clear what we have been saying this language already does, which is that it does not affect existing law relative to the right of the executive branch to capture and detain a citizen. If that law is there allowing it, it remains. If, as some argue, the law does not allow that, then it continues that way."[90]

Other senators, on both sides of the debate, also voiced their support and characterized the provision similarly.[91] The amendment passed by a vote of 99 to 1.[92]

Section 1031 of the Senate bill became the conference report's Section 1021. It passed Congress and was signed by President Obama on December 31, 2011. President Obama issued a signing statement that reiterated his position that Section 1021 "breaks no new ground and is unnecessary."[93] He cited Sections 1021(d) and (e) as "critical limitations" that "make clear beyond doubt that the legislation does nothing more than confirm authorities that the Federal courts have recognized as lawful under the 2001 AUMF."[94] He stated also that his administration "will not

---

[90]

*Id.* at S8,124 (statement of Sen. Levin) (paragraph break omitted).

[91]

*See id.* ("To this day, the Supreme Court has never ruled on the question of whether it is constitutional to indefinitely detain a U.S. citizen captured in the United States. Some of my colleagues see this differently, but the language we have agreed on makes it clear that section 1031 will not change that law in any way. The Supreme Court will decide who will be detained; the Senate will not.") (statement of Sen. Durbin); *id.* ("As to Senator Durbin, he has one view, I have another, but we have a common view; that is, not to do anything to 1031 that would change the law. The ultimate authority on the law is not Lindsey Graham or Dick Durbin, it is the Supreme Court of the United States. That is the way it should be, and that is exactly what we say here. We are doing nothing to change the law when it comes to American citizen detention to enhance it or to restrict whatever rights the government has or the citizen has.") (statement of Sen. Graham).

[92]

*Id.* at S8,125.

[93]

Statement by the President on H.R. 1540, 2011 WL 6917659, *1 (Dec. 31, 2011).

[94]

*Id.*

authorize the indefinite military detention without trial of American citizens" and "will interpret section 1021 in a manner that ensures that any detention it authorizes complies with the Constitution, the laws of war, and all other applicable law."[95]

### E.     Proceedings Below

Plaintiff Christopher Hedges filed the initial complaint in this case on January 13, 2012, alleging that Section 1021 violated, *inter alia*, the First and Fifth Amendments and seeking declaratory and injunctive relief.[96]  On February 27, 2012, he filed a verified amended complaint, which added a number of plaintiffs,[97] and moved for a temporary restraining order against enforcement of Section 1021, a motion that later was converted to a motion for a preliminary injunction.[98]  Plaintiffs submitted a number of affidavits in support of their motion, and the district court held an evidentiary hearing on March 30, 2012.[99]

Four plaintiffs submitted evidence that was considered by the district court and that is relevant to this appeal: two American citizens, Hedges and Alexa O'Brien,[100] and two non-

---

[95]

*Id.*

[96]

*Hedges v. Obama*, No. 12 Civ. 331 (KBF), Dkt. 1 (S.D.N.Y.) [hereinafter "Dist. Ct. Dkt."].

[97]

Dist. Ct. Dkt. 4-1 ¶¶ 2–8 (adding Daniel Ellsberg, Noam Chomsky, Jennifer Bolen, Kai Wargalla, Birgitta Jonsdottir, Alexa O'Brien, and US Day of Rage as plaintiffs).

[98]

*See* Dist. Ct. Dkt. 6.

[99]

Dist. Ct. Dkt. 10–14, 17–18, 34.

[100]

The district court's one reference to O'Brien's citizenship status stated that she is a non-citizen. *Hedges v. Obama*, 890 F. Supp.2d 424, 455 n.33 (S.D.N.Y. 2012).  Both the

citizens, Birgitta Jonsdottir and Kai Wargalla.[101]  They are journalists or members of advocacy

organizations who assert that they fear that their work makes them subject to indefinite detention

under Section 1021.[102]  The government submitted no evidence.

The district court granted the preliminary injunction by opinion filed May 16, 2012.[103]

It concluded that each plaintiff had an actual fear of detention under Section 1021 and that this fear

was reasonable.[104]  In reaching this latter conclusion, the court relied in significant part on the

government's initial refusal to represent that the plaintiffs' activities would not subject them to

detention under Section 1021.  It rejected the government's contention that Section 1021 was just

an "affirmation" of the AUMF that did nothing new.[105]  Determining further that the expressive

conduct of each plaintiff had been chilled and that each had incurred concrete costs as a reasonable

---

complaint and O'Brien's affidavit make clear that she asserts American citizenship, and there is nothing in the record suggesting otherwise.  The citizenship of the various plaintiffs was not particularly relevant to the district court's analysis.  We conclude that its reference to O'Brien as a non-citizen was a clerical error.

[101]

Hedges, O'Brien, and Wargalla were the only plaintiffs to testify at the hearing.  Jonsdottir did not testify but submitted an affidavit on consent of the parties.  The district court did not consider the other plaintiffs, and we need discuss them no further here.  In the remainder of this opinion, we refer to "plaintiffs" as denoting only these four individuals.

[102]

We discuss the testimony of plaintiffs in more detail as necessary below.

[103]

*Hedges v. Obama*, No. 12 Civ. 331 (KBF), 2012 WL 1721124 (S.D.N.Y. May 16, 2012).  Although the initial order could have been read to suggest that the district court enjoined Section 1021 in its entirety, *see id.* at *28, the court later clarified that the injunction applied only to Section 1021(b)(2), *see Hedges v. Obama*, No. 12 Civ. 331 (KBF), 2012 WL 2044565, *1 (S.D.N.Y. June 6, 2012).

[104]

*Hedges*, 2012 WL 1721124 at *16–17.

[105]

*Id.* at *13–14.

consequence of this fear, the court concluded that each plaintiff had standing to challenge Section 1021.[106]  It held that plaintiffs had shown a likelihood of success on claims that Section 1021 violated the First Amendment and was impermissibly vague in violation of the Fifth Amendment.[107] Finally, it concluded that the other relevant factors supported preliminary injunctive relief.[108]

The government moved for reconsideration on May 25, 2012, clarifying its position by stating that, "[a]s a matter of law, individuals who engage in the independent journalistic activities or independent public advocacy described in plaintiffs' affidavits and testimony, without more, are not subject to law of war detention as affirmed by section 1021(a)-(c), solely on the basis of such independent journalistic activities or independent public advocacy."[109]  By agreement of the parties, the court proceeded directly to permanent injunction proceedings (thus mooting the motion for reconsideration) and took no new evidence for purposes of the permanent injunction.

Concluding that the government's "newly espoused position" did not alter its previous conclusion as to plaintiffs' standing,[110] the court, on September 12, 2012, "permanently enjoin[ed] enforcement of § 1021(b)(2) in any manner, as to any person," generally affirming but also significantly expanding its prior analysis.[111]  It further held that "[m]ilitary detention based on

---

[106]

*Id.* at *19.

[107]

*Id.* at *19–25.

[108]

*Id.* at *25–28.

[109]

Dist. Ct. Dkt. 38 at 4.

[110]

*Hedges*, 890 F. Supp.2d at 429.

[111]

*Id.* at 472.

allegations of 'substantially supporting' or 'directly supporting' the Taliban, al-Qaeda, or associated forces, is not encompassed within the AUMF and is enjoined by this Order regarding § 1021(b)(2)."[112]

This appeal followed.[113] We granted a temporary stay of the district court's order on September 17, 2012, and then granted a stay pending appeal on October 2, 2012.

## II.    Discussion

The parties raise a number of important and difficult questions, but we need not reach most of them. We consider here only plaintiffs' standing under Article III of the Constitution. We begin with a brief discussion of the basic principles of Article III standing. We proceed to the proper construction of Section 1021 in relation to the AUMF. After clarifying what Congress did and did not do in passing Section 1021, we consider plaintiffs' standing given the record in this case. In that regard, we address first the American citizens, Hedges and O'Brien, and then the non-citizens, Jonsdottir and Wargalla.

### A.    General Principles of Standing

The judicial power of the United States, and thus the jurisdiction of federal courts, is limited by Article III of the Constitution to "Cases and Controversies."[114] One aspect of this

---

[112]

*Id.*

[113]

The government had appealed the district court's preliminary injunction order as well, and the two appeals were consolidated before this Court. The government correctly observes that its appeal of the preliminary injunction is now moot. *See Webb v. GAF Corp.*, 78 F.3d 53, 56 (2d Cir. 1996).

[114]

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013) (internal quotation marks omitted).

limitation is the requirement that the plaintiff have standing to sue, which "serves to prevent the judicial process from being used to usurp the powers of the political branches."[115] "The party invoking federal jurisdiction bears the burden of establishing standing."[116] The "'irreducible constitutional minimum'" requires that (1) the plaintiff "'have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical,'" (2) the injury be "'fairly traceable to the challenged action of the defendant,'" and (3) it "'be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"[117] Actual injury-in-fact exists when a defendant's actions have inflicted a concrete, present harm on the plaintiff. But the Supreme Court has recognized that a plaintiff in some circumstances may have standing to sue even when the plaintiff shows only an imminent threat of future harm or a present harm incurred in consequence of such a threat.[118] We discuss these criteria in more detail as needed below.

B.      *The Proper Construction of Section 1021*

We deal first with the meaning of Section 1021.

---

[115]

*Id.*

[116]

*Id.* at 1148 (internal quotation marks omitted).

[117]

*Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)) (alterations, emphasis, and other internal quotation marks omitted).

[118]

*See, e.g.*, *Lujan*, 504 U.S. at 564 & n.2; *Clapper*, 133 S. Ct. at 1150 n.5.

"As with any question of statutory interpretation, we begin by examining the text of the statute."[119]  In doing so, "we consider not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme."[120]  It is "one of the most basic interpretive canons[] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."[121]  But "in interpreting a statute a court should always turn first to one, cardinal canon before all others," namely that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete."[122]

The AUMF authorized the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons."[123] Section 1021(a) "affirms" that the AUMF authority includes the detention of a "covered

---

[119]

*Kar Onn Lee v. Holder*, 701 F.3d 931, 936 (2d Cir. 2012).

[120]

*Id.* (internal quotation marks omitted); *see United States v. Robinson*, 702 F.3d 22, 31 (2d Cir. 2012) ("[T]he words of a statute are not to be read in isolation; statutory interpretation is a holistic endeavor." (emphasis and internal quotation marks omitted)).

[121]

*Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation marks and alterations omitted).

[122]

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (internal quotation marks and citations omitted); *accord Carr v. United States*, 560 U.S. 438, 130 S. Ct. 2229, 2241 (2010); *United States v. Coppola*, 671 F.3d 220, 240 (2d Cir. 2012).

[123]

AUMF § 2(a).

person[]," which under Section 1021(b) means (1) a "person who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored those responsible for those attacks" or (2) a "person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces."

At first blush, Section 1021 may seem curious, if not contradictory. While Section 1021(b)(1) mimics language in the AUMF, Section 1021(b)(2) adds language absent from the AUMF. Yet Section 1021(a) states that it only "affirms" authority included under the AUMF, and Section 1021(d) indicates that Section 1021 is not "intended to limit or expand the authority of the President or the scope of the [AUMF]."

Fortunately, this apparent contradiction—that Section 1021 merely affirms AUMF authority even while it adds language not used in the AUMF—is readily resolved. It is true that the language regarding persons who "planned, authorized, committed, or aided" the 9/11 attacks (or harbored those who did) is identical in the AUMF and Section 1021(b)(1). The AUMF, however, does not merely define persons who may be detained, as does Section 1021(b). Instead, it provides the President authority to use "force" against the "nations, organizations, or persons" responsible for 9/11.[124] Section 1021(b)(1) (read with Section 1021(a)) affirms that the AUMF authority to use force against the *persons* responsible for 9/11 includes a power to detain such persons. But it does not speak to what additional detention authority, if any, is included in the President's separate AUMF authority to use force against the *organizations* responsible for 9/11.

---

[124] For brevity in this section we refer to one "responsible for 9/11" as synonymous with one who "planned, authorized, committed, or aided" the 9/11 attacks or harbored those who did so, as those terms are used in the AUMF and Section 1021(b)(1).

This is where Section 1021(b)(2), a provision concerned with the organizations responsible for 9/11—al-Qaeda and the Taliban—plays a role.[125] Section 1021(b)(2) naturally is understood to affirm that the general AUMF authority to use force against these organizations includes the more specific authority to detain those who were part of, or those who substantially supported, these organizations or associated forces.[126] Because one obviously cannot "detain" an organization, one must explain how the authority to use force against an organization translates into detention authority.[127] Hence, it is not surprising that Section 1021(b)(2) contains language that does not appear in the AUMF, notwithstanding Section 1021(d). Plaintiffs create a false dilemma when they suggest that either Section 1021 expands the AUMF detention authority or it serves no purpose.

Indeed, there are perfectly sensible and legitimate reasons for Congress to have affirmed the nature of AUMF authority in this way. To the extent that reasonable minds might have differed—and in fact very much did differ—over whether the administration could detain those who

---

[125]

The use of force against the Taliban may draw support also from the AUMF's reference to "nations" insofar as it was the government of Afghanistan when the AUMF was passed.

[126]

We are not the first to focus on the AUMF's mention of "organizations." Indeed, it is on this reference that almost every inquiry into the scope of AUMF detention authority has begun. *See Hamdi*, 542 U.S. at 518 (noting that AUMF authorizes use of force against "nations, organizations or persons" associated with 9/11 and then stating that "[t]here can be no doubt that individuals who fought against the United States in Afghanistan as part of the Taliban, an *organization* known to have supported the al Qaeda terrorist network responsible for those attacks, are individuals Congress sought to target in passing the AUMF" (emphasis added) (internal quotation marks omitted)); *Al-Bihani*, 590 F.3d at 873; *Hamlily*, 616 F. Supp.2d at 71; *Gherebi*, 609 F. Supp.2d at 55; *Al-Marri*, 534 F.3d at 259–61 (Traxler, J., concurring in judgment); *id.* at 286 (Williams, C.J., concurring in part and dissenting in part); *id.* at 298 (Wilkinson, J., concurring in part and dissenting in part).

[127]

*See* Chesney, *supra* note 6, at 790 ("The AUMF is entirely silent with respect to the mix of detention predicates and constraints that suffice to link a particular person to an AUMF-covered group for purposes of detention or otherwise."); *see also* Hathaway, *supra* note 60, at 136–39.

were part of or substantially supported al-Qaeda, the Taliban, and associated forces under the AUMF authority to use force against the "organizations" responsible for 9/11,[128] Section 1021(b)(2) eliminates any confusion on that particular point. At the same time, Section 1021(d) ensures that Congress' clarification may not properly be read to suggest that the President did not have this authority previously—a suggestion that might have called into question prior detentions. This does not necessarily make the section a "'legislative attempt at an ex post facto "fix" . . . to try to ratify past detentions which may have occurred under an overly-broad interpretation of the AUMF,'" as plaintiffs contend.[129] Rather, it is simply the 112th Congress' express resolution of a previously debated question about the scope of AUMF authority.[130]

It remains to consider what effect Section 1021(e) has on this understanding. That provision states that "[n]othing in this section shall be construed to affect existing law or authorities

---

[128]

*See, e.g.*, *Al-Bihani*, 590 F.3d at 872 (identifying authority to detain those "part of" and those who "purposefully and materially support" enemy forces); *Hamlily*, 616 F. Supp.2d at 77–78 (accepting "part of" but rejecting any reliance on "support"); *Gherebi*, 609 F. Supp.2d at 70–71 (accepting both "part of" and "substantial support" but imposing significant limits on what "substantial support" may encompass); *Al-Marri*, 534 F.3d at 323–29 (Wilkinson, J., concurring in part and dissenting in part) (identifying authority to detain individuals only if they are both members of an enemy organization and have taken steps to inflict harm to advance that organization's military goals); *id.* at 285 (Williams, C.J., concurring in part and dissenting in part) (requiring that individual have attempted or have engaged in belligerent acts against the United States on behalf of enemy force); *id.* at 231 (Motz, J., concurring in judgment) (making enemy combatant status turn on "affiliation with the military arm of an enemy nation").

[129]

Appellee Br. 15 (quoting *Hedges*, 890 F. Supp.2d at 429).

[130]

In so construing the statute, we express no view regarding whether the original AUMF, standing alone, implicitly authorized the detention of the individuals described by Section 1021(b)(2). *See Fed. Hous. Admin. v. Darlington, Inc.*, 358 U.S. 84, 90 (1958) ("Subsequent legislation which declares the intent of an earlier law is not, of course, conclusive in determining what the previous Congress meant."). We note only that this is the view that the 112th Congress set forth in Section 1021.

relating to the detention of United States citizens, lawful resident aliens of the United States, or any other persons who are captured or arrested in the United States." Although this provision may appear superficially similar to Section 1021(d), nuances in the text and the legislative history make clear that Section 1021(e) actually is a significantly different provision.

As discussed above, in stating that Section 1021 is not intended to limit or expand the scope of the detention authority under the AUMF, Section 1021(d) mostly made a statement about the original AUMF—that is, it indicated that the specific power to detain those who were part of or who substantially supported the enumerated forces had been implicit in the more generally phrased AUMF.[131] By contrast, in saying that Section 1021 shall not be construed to affect "existing law or authorities" relating to citizens, lawful resident aliens, or any other persons captured or arrested in the United States, Section 1021(e) expressly disclaims any statement about existing authority. Rather, it states only a limitation about how Section 1021 may be construed to affect that existing authority, whatever that existing authority may be.[132]

This understanding is reinforced by the legislative history. As discussed above, Senator Feinstein and others feared that Section 1021 would greatly expand the power of the government with particular reference to the authority to detain American citizens captured domestically. Senator Feinstein explained that she did not believe the government had such authority while Senators Graham and Levin, perhaps among others, believed that the government

---

131

    As we have no occasion in this opinion to construe the scope of the terms contained in Section 1021(b)(2), we need not consider whether Section 1021(d) may have some bearing also on how narrowly or broadly those terms should be construed.

132

    A contrary interpretation of Section 1021(e) would risk rendering the provision surplusage in light of Section 1021(d).

already did. Thus, Section 1021(e) was introduced specifically to effect a "truce" that ensured that—as to those covered by Section 1021(e)—courts would decide detention authority based not on Section 1021(b), but on what the law previously had provided in the absence of that enactment. This is not to say that Section 1021(e) specifically "exempts" these individuals from the President's AUMF detention authority, in the sense that Section 1022 expressly exempts United States citizens from its requirements.[133] Rather, Section 1021(e) provides that Section 1021 just does not speak—one way or the other—to the government's authority to detain citizens, lawful resident aliens, or any other persons captured or arrested in the United States.[134]

We thus conclude, consistent with the text and buttressed in part by the legislative history, that Section 1021 means this: With respect to individuals who are not citizens, are not lawful

---

[133]

Under that section, the President shall hold in military detention members of al-Qaeda or associated forces participating in an attack against the United States or coalition partners, subject to a national security waiver. This requirement, however, "does not extend to [the detention of] citizens of the United States." 2012 NDAA § 1022(b)(1).

[134]

To the extent that the text of Section 1021(e) may not make explicit whether "captured or arrested in the United States" is meant to modify only "any other persons" rather than modifying also "United States citizens" and "lawful resident aliens of the United States," we conclude that the former reading is correct. First, because commas follow "United States citizens" and "lawful resident aliens of the United States" but not "any other persons," under the rule of the last antecedent we read the limiting phrase as modifying only the term immediately preceding it, unless a contrary intention is apparent. *See Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 782 (2d Cir. 2013); *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 681 (2d Cir. 2010). Second, the alternative reading would render superfluous Congress' references to citizens and lawful resident aliens—Congress could have much more simply referred to "persons captured or arrested in the United States." Finally, legislative history provides no reason to conclude otherwise. Although Senator Feinstein suggested that her principal concern was the detention of American citizens apprehended on American soil, she and other senators expressed concern about the detention of American citizens generally, *see, e.g.*, 157 Cong. Rec. S7,943-01, S7,953 (daily ed. Nov. 29, 2011) (statement of Sen. Leahy), and the amendment was described in such terms, *see* 157 Cong. Rec. S8,094-03, S8,124 (daily ed. Dec. 1, 2011) (statements of Sen. Levin and Sen. Graham).

resident aliens, and are not captured or arrested within the United States, the President's AUMF authority includes the authority to detain those responsible for 9/11 as well as those who were a part of, or substantially supported, al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners—a detention authority that Section 1021 concludes was granted by the original AUMF. But with respect to citizens, lawful resident aliens, or individuals captured or arrested in the United States, Section 1021 simply says nothing at all.[135]

We recognize that Section 1021 perhaps could have been drafted in a way that would have made this clearer and that the absence of any reference to American citizens in Section 1021(b) led the district court astray in this case.[136] Perhaps the last-minute inclusion of Section 1021(e) as an amendment introduced on the floor of the Senate explains the somewhat awkward construction. But that is neither here nor there. It is only our construction, just described, that properly gives effect to the text of all of the parts of Section 1021 and thus reflects congressional intent.[137]

---

[135]

Plaintiffs read Section 1021(e) as preserving only habeas corpus rights to such individuals. This argument is unpersuasive. Section 1021(e) refers to "existing law or authorities"—a broad term that bears no indication that it should be limited to habeas rights, particularly when Section 1021 says nothing else about habeas.

[136]

*See Hedges*, 890 F. Supp.2d at 468 (noting that Section 1021(b)(2) "does not exclude American citizens").

We note further that while the district court erred in its treatment of Section 1021(e), *see id.* at 466 n.40, the government invited the error by failing adequately to address the provision throughout the proceedings below. While the government cited Section 1021(e) in its briefs opposing the preliminary and permanent injunctions, the citations were brief and simply combined Sections 1021(d) and (e) in support of the general argument that Section 1021 only reaffirmed the AUMF.

[137]

Because we conclude that the text of Section 1021(e) is clear and that our view of it is confirmed by the legislative history, we need not consider whether our interpretation is supported also by the requirement we previously have imposed for "clear congressional authorization" of the detention of American citizens apprehended on American soil under

C.       *American Citizen Plaintiffs*

With this understanding of Section 1021, we may dispose of the claims of the citizen plaintiffs, Hedges and O'Brien. As discussed above, Section 1021 says nothing at all about the authority of the government to detain citizens. There simply is no threat whatsoever that they could be detained pursuant to that section.[138] While it is true that Section 1021(e) does not foreclose the possibility that previously "existing law" may permit the detention of American citizens in some circumstances—a possibility that *Hamdi* clearly envisioned in any event—Section 1021 cannot itself be challenged as unconstitutional by citizens on the grounds advanced by plaintiffs because as to them it neither adds to nor subtracts from whatever authority would have existed in its absence. For similar reasons, plaintiffs cannot show that any detention Hedges and O'Brien may fear would be redressable by the relief they seek, an injunction of Section 1021.

Plaintiffs appear to contend that, even if Section 1021 is not applicable to Hedges and O'Brien, the wording of Section 1021(e) seems to "assume" that citizens may be detained if they have substantially supported al-Qaeda and that Hedges and O'Brien therefore have standing to challenge it. We disagree. There is nothing in Section 1021 that makes any assumptions about the government's authority to detain citizens under the AUMF. Rather, Section 1021(e) quite specifically makes clear that the section should not be construed to affect in any way existing law or authorities relating to citizen detention, whatever those authorities may provide.

---

the Non-Detention Act. *Padilla*, 352 F.3d at 699, *rev'd on jurisdictional grounds*, 542 U.S. 426. Nor need we consider whether this interpretation is supported by the canon of constitutional avoidance. *See* Ctr. for Nat'l Sec. Studies Amici Br. 7, 10, 12 (advancing these arguments).

[138]   We have no occasion to consider whether Hedges and O'Brien would have standing to challenge the AUMF, as no such challenge is presented here. Nor need we consider the scope of the government's authority to detain American citizens under the AUMF.

### D.      Non-citizen Plaintiffs

The claims of Jonsdottir and Wargalla stand differently.  Whereas Section 1021 says nothing about the government's authority to detain citizens, it does have real meaning regarding the authority to detain individuals who are not citizens or lawful resident aliens and are apprehended abroad.[139]  It provides that such individuals may be detained until the end of hostilities if they were part of or substantially supported al-Qaeda, the Taliban, or associated forces.  To be sure, Section 1021 in substance provides also that this authority was implicit in the original AUMF.  But, as discussed above, that the 112th Congress in passing Section 1021 expressed such a view does not mean that Section 1021 itself is a nullity.  It is not immediately apparent on the face of the AUMF alone that the President had the authority to detain those who substantially supported al-Qaeda, and indeed many federal judges had concluded otherwise prior to Section 1021's passage.  Hence, Section 1021(b)(2) sets forth an interpretation of the AUMF that had not previously been codified by Congress.  Where a statute codifies an interpretation of an earlier law that is subject to reasonable dispute, the interpretive statute itself may affect the rights of persons under the earlier law.

As the standing inquiry as to these two plaintiffs is more involved, we discuss the relevant facts and applicable law in detail.[140]

---

[139] No party contends that either Jonsdottir or Wargalla is a lawful resident alien.

[140] Our dismissal of the citizen plaintiffs exposes an issue that the district court did not have occasion to address below, whether Jonsdottir and Wargalla may assert First or Fifth Amendment rights under the Constitution.  Both are non-citizens who live abroad and have few, if any, connections to the United States.  In *United States v. Verdugo-Urquidez*, the Supreme Court observed that the First Amendment's reference to "the people" suggested that the rights belong "to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." 494 U.S. 259, 265 (1990) (suggesting further that an "[e]xcludable alien is not entitled to First Amendment rights, because 'he does not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden by

*1.      Relevant Facts*

Jonsdottir is a citizen of Iceland and a member of its parliament. She is an activist and spokesperson for a number of groups, including WikiLeaks, an organization famous for releasing troves of classified information of the United States government to the public. In early 2010, Jonsdottir helped WikiLeaks produce the video *Collateral Murder*, which allegedly depicts an American helicopter opening fire on unarmed individuals in Iraq. She testified that, around the same time, she had been working with people around the world, including some at WikiLeaks, to create a safe haven for freedom of information in Iceland. Jonsdottir testified that *Collateral Murder* made WikiLeaks known to the world shortly before its release later in 2010 of the Afghan and Iraq war logs and a substantial number of State Department cables—classified information allegedly leaked to WikiLeaks by one Bradley Manning. Jonsdottir further testified that she is aware that Manning has been charged by the United States government for aiding the enemy on the ground that he knew the classified information he provided to WikiLeaks would end up in the hands of al-Qaeda. She testified that a number of American politicians have called WikiLeaks a terrorist organization

---

law'" (quoting *U.S. ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904)) (alterations omitted)); *see also DKT Mem'l Fund v. Agency for Int'l Dev.*, 887 F.2d 275, 284 (D.C. Cir. 1989). Moreover, *Verdugo-Urquidez* read *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950), as "emphatic[ally]" rejecting the "extraterritorial application of the Fifth Amendment." 494 U.S. at 269. *But see id.* at 290–91 (Brennan, J., dissenting) (contending that *Eisentrager* was specific to the rights of enemy soldiers).

The case law regarding extraterritorial application of constitutional rights is sparse. *Verdugo-Urquidez* itself was a Fourth Amendment case. The relevant facts in the present case were not developed below as they were not necessary to the district court's decision. We therefore decline to consider this issue, which is not necessary in order to resolve the case before us. We assume, without deciding, that Jonsdottir and Wargalla may assert First and Fifth Amendment rights.

and that the government has been considering criminal charges against the organization and its founder, Julian Assange. As part of this investigation, she has received a subpoena from a federal grand jury for content from her Twitter account. She has received a number of invitations to speak in the United States, but will not travel here—thereby forgoing contacts and compensation—because of the subpoena and her fears of detention under Section 1021.

Wargalla, a German citizen, is an organizer and activist based in London, and is associated with the organizations Revolution Truth, Occupy London, and Justice for Assange UK. She testified that Occupy London has been listed as a terrorist group by the City of London police department. Moreover, she testified that she has been a supporter of WikiLeaks since 2010 as it was releasing the classified information noted above. Since January 2011, she has organized rallies, demonstrations, and protests on behalf of Assange and Manning. She testified that she has met Assange, who is familiar with her support, and has had contact with other employees of WikiLeaks. Wargalla testified that her fears of detention under Section 1021 have made it nearly impossible to pursue her everyday work.

The district court found that both Jonsdottir and Wargalla had an actual fear of detention under Section 1021 and had incurred costs and other present injuries due to this fear.[141]

### 2. *Fear-based Standing Law*

We have no occasion to disturb the factual findings of the district court, which are well-supported by the record, or to question the truth of the factual testimony of the plaintiffs, which

---

[141] *Hedges*, 890 F. Supp.2d at 436–37.

the district court found credible.[142]  Rather, we are faced only with a question of law: whether the non-citizen plaintiffs' fears of enforcement, as well as any present costs they have incurred as a result of those fears, establish their standing to bring this challenge.

As discussed earlier, the Supreme Court has recognized that such fears may support standing when the threat creating the fear is sufficiently imminent.  The Supreme Court's jurisprudence regarding how imminent a threat must be in order to support standing, however, has been less than clear.  In *Clapper v. Amnesty International USA*,[143] the Court recently concluded that the plaintiffs did not have standing to challenge a statute expanding the government's surveillance capabilities as violating, *inter alia*, the First and Fourth Amendments because they had failed to show that government interceptions of their communications were "certainly impending."[144]  The Court further concluded that, to the extent the plaintiffs had suffered present injuries because of their fear of such interception, they "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending."[145]  Yet at the same time, a footnote in *Clapper* recognized that the Court has not uniformly required that it be "literally certain that the harms [plaintiffs] identify will come about" and sometimes found standing to sue where

---

[142]

*See id.* at 432.

[143]

133 S. Ct. 1138.

[144]

*Id.* at 1143 (internal quotation marks omitted).  In applying the relevant standing principles below, the district court did not have the benefit of *Clapper*—decided after oral argument of this appeal—but instead was bound by our prior decision in that case, which the Supreme Court reversed.  *See Amnesty Int'l USA v. Clapper*, 638 F.3d 118 (2d Cir. 2011), *rev'd*, 133 S. Ct. 1138.

[145]

*Id.*

plaintiffs showed only a "'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm."[146] The Court did not explain when such a standard might apply, noting only that the plaintiffs in *Clapper* failed that test as well to whatever extent it might have been relevant and distinct.[147]

One of the cases that *Clapper* cited as using a potentially more permissive standard was a preenforcement challenge to a criminal statute.[148] In *Babbitt v. United Farm Workers National Union*,[149] the Court held that when a plaintiff "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."[150] Put differently, the Court held that a plaintiff has standing to make a preenforcement challenge "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative."[151] It has applied that

---

[146] *Id.* at 1150 n.5.

[147] *Id.*

[148] *Id.* (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Note that *Babbitt* does not use the term "substantial risk," however. That term came from a different case cited by the *Clapper* footnote, *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2754–55 (2010).

[149] 442 U.S. 289.

[150] *Id.* at 298 (internal quotation marks omitted); *see id.* (noting more generally that a plaintiff "must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement").

[151] *Id.* at 302.

principle in a number of cases challenging criminal statutes—finding standing where the plaintiff

"will have to take significant and costly compliance measures or risk criminal prosecution"[152]—and

in the civil context as well.[153]  The First Circuit has observed that the *Babbitt* standard sets a "low

threshold" and is "quite forgiving" to plaintiffs seeking such preenforcement review.[154]

Part of what makes the Court's approach in these cases "forgiving" is that it appears

willing to presume that the government will enforce the law as long as the relevant statute is "recent

and not moribund."[155]  Thus, in numerous preenforcement cases where the Supreme Court has found

---

[152]

*Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988); *see id.* at 393 (finding standing where plaintiffs had "actual and well-founded fear that the law will be enforced against them"); *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2717 (2010) ("*HLP*") (concluding that case was justiciable because plaintiffs faced "credible threat of prosecution" under material support statute based on their stated intended activities (internal quotation marks omitted)); *Doe v. Bolton*, 410 U.S. 179, 188–89 (1973) (identifying justiciable controversy in challenge to recent criminal abortion statute because plaintiffs faced "sufficiently direct threat of personal detriment" even though no prosecution had been threatened); *but see Poe v. Ullman*, 367 U.S. 497, 507–08 (1961) (plurality opinion) (concluding that where contraceptive statute had been on books for eighty years and been enforced only once, preenforcement challenge was not justiciable); *id.* at 509 (Brennan, J., concurring in judgment) (similar).

We have read the differing language of these cases to imply that the requisite standard for standing varies with the constitutional right asserted. *See Am. Booksellers Found. v. Dean*, 342 F.3d 96, 101 (2d Cir. 2003) (concluding that "actual and well-founded fear" standard governed First Amendment challenges, while the "slightly higher" standard of "realistic danger" governed non-First Amendment challenges (internal quotation marks omitted)). We need not here decide whether this distinction survives subsequent Supreme Court jurisprudence. *See HLP*, 130 S. Ct. at 2717 (applying "credible threat of prosecution" standard to challenge involving both First and Fifth Amendments).

[153]

*See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129–30 (2007) (concluding that plaintiff need not expose itself to civil liability by breaching royalty agreement when it seeks declaratory judgment that no royalties are owed).

[154]

*N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 14–15 (1st Cir. 1996).

[155]

*Doe*, 410 U.S. at 188.

standing on a showing that a statute indisputably proscribed the conduct at issue, it did not place the

burden on the plaintiff to show an intent by the government to enforce the law against it. Rather,

it presumed such intent in the absence of a disavowal by the government or another reason to

conclude that no such intent existed.[156]

These cases do not explain how to evaluate preenforcement standing when it is not

apparent whether a plaintiff is subject to the statute and when the government actively disputes that

it is. Nor do they address a situation in which the government disavowed any intention to prosecute

plaintiff, regardless of the appropriate interpretation of the statute.[157] But this Court did consider

such circumstances in *Vermont Right to Life Committee v. Sorrell*.[158]

The state there argued that the plaintiff lacked standing because the statute did not

proscribe plaintiff's conduct. A divided panel of this Court rejected that argument in reliance on

---

[156]

> *See HLP*, 130 S. Ct. at 2717 (noting that "Government has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they wish to do"); *Am. Booksellers*, 484 U.S. at 393 (noting that "State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise"); *Babbitt*, 442 U.S. at 302 (identifying justiciable controversy, even though "criminal penalty provision has not yet been applied and may never be applied to commissions of unfair labor practices" in part because "State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices").

[157]

> *See HLP*, 130 S. Ct. at 2717; *Am. Booksellers*, 484 U.S. at 393; *Babbitt*, 442 U.S. at 302.
>
> In *Poe v. Ullman*, a plurality of the Court did opine that "the mere existence of a state penal statute would constitute insufficient grounds to support a federal court's adjudication of its constitutionality in proceedings brought against the State's prosecuting officials if real threat of enforcement is wanting." 367 U.S. at 507 (citing *Ex parte La Prade*, 289 U.S. 444, 458 (1933)). The plurality went on to observe that "[i]f the prosecutor expressly agrees not to prosecute, a suit against him for declaratory and injunctive relief is not such an adversary case as will be reviewed here." *Id.* (citing *C.I.O. v. McAdory*, 325 U.S. 472, 475 (1945)).

[158]

> 221 F.3d 376 (2d Cir. 2000).

*Babbitt*. The majority concluded that "while there may be other, perhaps even better, definitions" of the disputed statutory term, plaintiff's interpretation of the statute, which would have covered its conduct, was "reasonable enough that [plaintiff] may legitimately fear that it will face enforcement of the statute by the [s]tate brandishing the definition proffered" by plaintiff.[159] To the extent that the state contended that it had no intention of suing plaintiff for its activities, we said "there is nothing that prevents the [s]tate from changing its mind" and that allowing the state's presently stated intention to defeat standing "would be placing [plaintiff's] asserted First Amendment rights at the sufferance of Vermont's Attorney General."[160]

Similarly, in *Pacific Capital Bank v. Connecticut*,[161] we relied on *Vermont Right to Life* to hold that plaintiff established standing to challenge a civil penalty provision despite the state's argument that it never had enforced the statute against anyone and that "it is unknown how the [s]tate will apply that section in any future enforcement action."[162]

### 3. Coverage Under Section 1021(b)(2)

As in *Vermont Right to Life*, the government here disputes that plaintiffs are subject to the statute. Plaintiffs never articulate a precise theory on which they fear detention under Section

---

[159] *Id.* at 383.

[160] *Id.* (internal quotation marks omitted); *accord Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1192 (10th Cir. 2000) (rejecting reliance on representation by state that plaintiffs will not be prosecuted, citing *Vt. Right to Life*).

[161] 542 F.3d 341 (2d Cir. 2008).

[162] *Id.* at 350.

1021(b)(2)—that is, in what sense the government may conclude that they were a "part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners." The strongest argument would seem to be a contention that the work of Jonsdottir and Wargalla substantially, if indirectly, supports al-Qaeda and the Taliban as the term "support" is understood colloquially.[163] The record demonstrates a number of ways in which the government has concluded, or would have a basis to conclude, that WikiLeaks has provided some support to al-Qaeda and the Taliban. This includes the evidence that the government is prosecuting Manning for aiding the enemy by his releases to WikiLeaks and news articles in the record or cited by the Jonsdottir declaration reporting on the immense amount of classified information that WikiLeaks made public, much of which is related specifically to the government's military efforts against al-Qaeda and the Taliban.[164] One perhaps might fear that

---

[163]

> Both Jonsdottir and Wargalla refer extensively also to suggestions by some that WikiLeaks is a terrorist organization. But Section 1021(b)(2) on its face does not authorize the President to detain an individual solely for supporting any terrorist group. Rather, the individual must have substantially supported "associated forces that are engaged in hostilities against the United States or its coalition partners." Plaintiffs do not attempt to show that WikiLeaks could be deemed such a force.
>
> Wargalla contends also that Occupy London is viewed as a terrorist group, and she fears that the group may be deemed "associated" with al-Qaeda because both groups were mentioned (along with the Revolutionary Armed Forces of Colombia (FARC) and two individuals who bombed a railway in Belarus) on a London police document entitled "Terrorism/Extremism update for the City of London Business Community." Dist. Ct. Dkt. 18-2. We need not develop a sophisticated understanding of the term "associated" under Section 1021(b)(2) to dismiss the contention that it is sufficient to show merely that the group has been listed on the same government document as al-Qaeda.

[164]

> One article reports that the Taliban threatened to hunt down Afghan civilians cooperating with NATO forces whose names WikiLeaks revealed. *See* Philip Shenon, "U.S. Urges Allies to Crack Down on WikiLeaks," THE DAILY BEAST (Aug. 10, 2010), *available at* http://www.thedailybeast.com/articles/2010/08/10/a-western-crackdown-on-wikileaks.html.
>
> Another reports that WikiLeaks confirmed previously secret American involvement in an

Jonsdottir's and Wargalla's efforts on behalf of WikiLeaks could be construed as making them indirect supporters of al-Qaeda and the Taliban as well.

The government rejoins that the term "substantial support" cannot be construed so in this particular context. Rather, it contends that the term must be understood—and limited—by reference to who would be detainable in analogous circumstances under the laws of war. It points to (1) the *Hamdi* plurality's limitation of the duration of the detention authority it recognized based on the laws of war, (2) the March 2009 Memo's repeated invocation of law-of-war limiting principles and the legislative history suggesting that Section 1021 was meant to codify the interpretation that the Memo set forth, (3) Section 1021(d), to the extent that *Hamdi* and the administration suggested that the laws of war inform AUMF authority, as bearing on how broadly "substantial support" may be construed, and (4) the references to "law of war" in Section 1021 itself, albeit not in Section 1021(b)(2). The government then contends that individuals like Jonsdottir and Wargalla are civilians who are not detainable under these law-of-war principles and so cannot reasonably fear detention under Section 1021.

In these circumstances, we are faced with a somewhat peculiar situation. The government has invited us to resolve standing in this case by codifying, as a matter of law, the meaningful limits it has placed on itself in its interpretation of Section 1021. We decline the government's invitation to do so. Thus, we express no view regarding whether the laws of war inform and limit detention authority under Section 1021(b)(2) or whether such principles would

---

attack that allegedly killed al-Qaeda militants in Yemen. *See* Glenn Greenwald, "Obama's personal role in a journalist's imprisonment," SALON.COM (Mar. 14, 2012), *available at* http://www.salon.com/2012/03/14/obamas_personal_role_in_a_journalists_imprisonment/.

Because standing is wanting in any event, we need not consider whether the fact that these articles were not admitted for the truth of the matters they assert affects the analysis.

foreclose the detention of individuals like Jonsdottir and Wargalla. This issue presents important questions about the scope of the government's detention authority under the AUMF, and we are wary of allowing a preenforcement standing inquiry to become the vehicle by which a court addresses these matters unless it is necessary. Because we conclude that standing is absent in any event, we will assume without deciding that Section 1021(b)(2) covers Jonsdottir and Wargalla in light of their stated activities.[165]

### 4. Threat of Enforcement

We next consider whether there is a sufficient threat of enforcement even given this assumption. This inquiry corresponds to (1) our suggestions in *Vermont Right to Life* and *Pacific Capital Bank* that a plaintiff has standing when it "'may legitimately fear that it will face enforcement'" under its reasonable interpretation of the statute[166] and (2) the Supreme Court's recognition that a preenforcement challenge is justiciable when enforcement is a "realistic danger,"[167] when there is a "credible threat of prosecution,"[168] or when a plaintiff has an "actual and well-founded fear"[169] of such enforcement. As noted above, however, neither this Court nor the

---

[165] Of course, it would do so only insofar as they fear the United States apprehending them abroad. Under Section 1021(e), Section 1021 has no bearing on the government's authority to detain any individual captured or arrested in the United States.

[166] *Pacific Capital Bank*, 542 F.3d at 350 (quoting *Vt. Right to Life*, 221 F.3d at 383).

[167] *Babbitt*, 442 U.S. at 298.

[168] *Id.* (citing *Doe*, 410 U.S. at 188); *accord HLP*, 130 S. Ct. at 2717.

[169] *Am. Booksellers Ass'n*, 484 U.S. at 393.

Supreme Court has required much to establish this final step in challenges to ordinary criminal or civil punitive statutes. Rather, we have presumed that the government will enforce the law.

The question is the extent to which such a presumption is applicable here. The district court concluded that it was, reasoning that Section 1021 "is equivalent to a criminal statute" because "the possibility of being placed in indefinite military detention is the equivalent of a criminal penalty."[170] Certainly we agree that military detention until the termination of hostilities would be severe and that the prospect of such detention can be "as inhibiting of speech as can trepidation in the face of threatened criminal prosecution."[171] But that is a separate question from whether it is appropriate to presume that Section 1021 will be enforced as would any criminal or civil punitive statute.

On this point, there are several important differences between Section 1021 and a typical statute imposing criminal or civil penalties. Section 1021 is not a law enforcement statute, but an affirmation of the President's military authority.[172] As discussed above, it applies only to individuals who are not citizens, are not lawful resident aliens, and are apprehended outside the United States. It thus speaks entirely to the authority of the President in the context of military force, national security, and foreign affairs, areas in which the President generally enjoys "unique

---

[170] *Hedges*, 890 F. Supp.2d at 450 n.29.

[171] *Vt. Right to Life*, 221 F.3d at 382.

[172] The *Hamdi* plurality observed that military detention "'is neither a punishment nor an act of vengeance, but merely a temporary detention which is devoid of all penal character. A prisoner of war is no convict; his imprisonment is a simple war measure.'" 542 U.S. at 518 (quoting W. Winthrop, Military Law and Precedents 788 (rev. 2d ed. 1920)) (other internal quotation marks and alterations omitted).

responsibility"[173] and "broad discretion."[174]  The Supreme Court has recognized that "Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take" in the fields of national security and foreign affairs.[175]  As a result, "Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas."[176]

Moreover, Section 1021 "at most *authorizes*—but does not *mandate* or *direct*"— the detention that plaintiffs fear.[177]  To be sure, the executive branch enjoys prosecutorial discretion with regard to traditional punitive statutes.  Congress generally does not mandate or direct criminal prosecution or civil enforcement.[178]  But we can distinguish between Congress, on the one hand, proscribing a certain act and then leaving it to the President to enforce the law under his constitutional duty to "take Care that the Laws be faithfully executed"[179] and Congress, on the other hand, authorizing the President to use a certain kind of military force against non-citizens abroad.

---

[173]

*Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415 (2003) (internal quotation marks omitted).

[174]

*Olegario v. United States*, 629 F.2d 204, 233 (2d Cir. 1980).

[175]

*Dames & Moore v. Regan*, 453 U.S. 654, 678 (1981).

[176]

*Haig v. Agee*, 453 U.S. 280, 292 (1981) (emphasis and internal quotation marks omitted).

[177]

*Clapper*, 133 S. Ct. at 1149 (emphasis in original).

[178]

*See Abuelhawa v. United States*, 556 U.S. 816, 823 n.3 (2009) (recognizing that "Congress legislates against a background assumption of prosecutorial discretion").

[179]

U.S. CONST. art. II, § 3; *accord United States v. Valenzuela-Bernal*, 458 U.S. 858, 863 (1982) ("One of the duties of the Executive Branch, and a vitally important one, is that of apprehending and obtaining the conviction of those who have violated criminal statutes of the United States.").

Consequently, there is a world of difference between assuming that a state executive will enforce a statute imposing civil penalties for certain campaign finance violations[180]—or even that the executive branch will enforce a federal criminal statute barring provision of material support to terrorists[181]—and assuming that the President will detain any non-citizen abroad that Congress authorizes him to detain under the AUMF. *Clapper* further supports this understanding, as it made clear that plaintiffs cannot establish standing on the basis of speculation about how the government may choose to utilize its authority to engage in foreign surveillance.[182] In short, while it generally may be appropriate to presume for standing purposes that the government will enforce the law against a plaintiff covered by a traditional punitive statute, such a presumption carries less force with regard to a statute concerned entirely with the President's authority to use military force against non-citizens abroad.[183] Thus, in the circumstances of this case, Jonsdottir and Wargalla must show more than that the statute covers their conduct to establish preenforcement standing.

---

[180]

*Vt. Right to Life*, 221 F.3d 376.

[181]

*HLP*, 130 S. Ct. 2705.

[182]

*See* 133 S. Ct. at 1148–49.

[183]

We do not rely on any notion that Article III standing rules are different just because this case implicates national security and foreign affairs. Rather, we note only that plaintiffs in the circumstances presented need to show more to establish a sufficiently imminent threat of enforcement; Congress and the Constitution provide the President with broad discretion in these areas and thus a presumption of enforcement may be less apt. This is consistent with the Supreme Court's observation that it has "often found a lack of standing in cases in which the Judiciary has been requested to review actions of the political branches in the fields of intelligence gathering and foreign affairs." *Id.* at 1147.

We need not quantify precisely what more is required[184] because Jonsdottir and Wargalla have shown nothing further here. Indeed, they have not established a basis for concluding that enforcement against them is even remotely likely. We reach this conclusion independent of the government's litigation position on appeal that plaintiffs are "in no danger whatsoever" of being detained on the basis of their stated activities.[185]

First, even assuming that Jonsdottir and Wargalla fall within the ambit of authority provided by the statute, this is certainly not a case in which "the law is aimed directly at plaintiffs."[186] They point to nothing in the record, or in the text or legislative history of Section 1021, that suggests that the statute was passed to facilitate the military detention of individuals specifically like them.

Second, while we do not hold that a specific threat of enforcement is necessary, neither Jonsdottir nor Wargalla has adduced any evidence that the government intends or has

---

[184]

In particular, we need not determine whether, in light of the foregoing considerations, the preenforcement *Babbitt* line of cases is inapplicable altogether and whether plaintiffs must satisfy the *Clapper* "certainly impending" standard to prevail. Nor need we resolve whether the proper preenforcement standard is "legitimate fear," "realistic danger," "credible threat of prosecution," or "actual and well-founded fear," or—more to the point—whether there is any meaningful difference among these standards. *Cf. Amnesty Int'l USA v. McConnell*, 646 F. Supp.2d 633, 644 n.12 (S.D.N.Y. 2009) (questioning this Court's prior suggestion that "realistic danger" is a slightly higher standard than "actual and well-founded fear"), *vacated on other grounds sub nom.* 638 F.3d 118, *rev'd*, 133 S. Ct. 1138; *Clapper*, 133 S. Ct. at 1160–61 (Breyer, J., dissenting) (listing other terms Supreme Court has used to describe requisite imminence in cases of future harm).

[185]

Appellant Br. 1.

[186]

*Am. Booksellers*, 484 U.S. at 392.

threatened to place them in military detention.[187]

Third, they have not put forth evidence that individuals even remotely similarly situated have been subjected to military detention.[188] The government argues that this latter failure

[187]

Jonsdottir testified that she has been subject to a U.S. grand jury subpoena as part of a criminal investigation into WikiLeaks. Even assuming that the mere issuance of a subpoena demonstrates intent to prosecute Jonsdottir criminally—not a reasonable assumption in any event—*Clapper* makes clear that this would not help her cause. The Court there concluded that evidence of surveillance under a prior statute detracted from standing, because plaintiffs could only speculate about whether any government surveillance would occur under the new statute, rather than under other existing authority. *See* 133 S. Ct. at 1152. Likewise here, the evidence that the government may have been *criminally* investigating Jonsdottir would not support her fear of *military* detention.

For similar reasons, the evidence that the administration is prosecuting Bradley Manning for aiding al-Qaeda and that administration officials and members of Congress have described WikiLeaks as a terrorist organization does not support plaintiffs' position.

[188]

A record article concerns one Sami Alhaj, who reportedly had worked for Al Jazeera as a cameraman before his military detention at Guantánamo. *See* Magda Abu-Fadil, *Sami Alhaj: From Gitmo Detainee Back to Al Jazeera as Liberties/Human Rights Advocate*, HUFFINGTON POST (Jan. 6, 2012), *available at* http://www.huffingtonpost.com/magda-abufadil/sami-alhaj-Guantanamo_b_1189590.html. But that same article quotes a Department of Defense memorandum listing Alhaj as a member of al-Qaeda who was a money courier, propagandist, and logistics expert involved in a plan to provide Stinger missiles to Islamic extremists in Chechnya. We cannot conclude that Alhaj is situated similarly to Jonsdottir and Wargalla in these circumstances.

Record articles report also that the Obama administration purportedly encouraged the Yemeni government not to pardon a Yemeni journalist, Abdulelah Haider Shaye, convicted of terrorism-related charges. *See, e.g.*, Greenwald, *supra* note 164. The record does not explain the administration's concerns, however, notwithstanding the speculation of one article's author that it was upset about Shaye's reporting of allegedly embarrassing information. Moreover, Shaye was not held by the United States military, rendering his case quite different from what plaintiffs fear.

The district court concluded that it was "patently unfair" to expect plaintiffs to point to examples of similarly situated individuals being detained, as the reasons individuals may be detained generally is known only to the government. *Hedges*, 890 F. Supp.2d at 439 n.19. But *Clapper*—issued after the district court's decision—makes clear that the secrecy of government action does not relieve plaintiffs of the burden to establish standing. In any event, we do not require plaintiffs to come forward with any specific kind of evidence, including that of similarly situated individuals who have been detained. We hold only that

is particularly meaningful because, it contends, Section 1021 codified an interpretation "that the President had long articulated and exercised and that the Judiciary had repeatedly recognized."[189]

To be sure, the government overstates its case on this point. As the history of litigation regarding the scope of AUMF detention authority shows, numerous courts criticized or rejected the government's reliance on substantial support in the March 2009 Memo. Prior to that, a divided Fourth Circuit set forth a number of different interpretations of executive detention authority, none of which resembled the government's position.[190] While the D.C. Circuit's decision in *Al-Bihani* is supportive of the government's standard, it focused primarily on a "purposeful and material support" standard, the relationship of which to "substantial support" is not clear. Simply put, to the extent that Congress resolved a previously debated question about the scope of AUMF detention authority in passing Section 1021, it was not obvious that the answer it provided is the one that ultimately would have prevailed had Congress not passed anything at all.[191] In light of this uncertainty, at least in principle Section 1021's codification of the "substantial support" standard could place the administration on stronger footing to detain individuals under such a theory than it might have been willing to risk previously.

the evidence submitted here is insufficient to meet plaintiffs' burden.

[189]

Appellant Br. 8.

[190]

*But see* Vladeck, *supra* note 60, at 1457 n.36 (noting that some constraints identified by *Al-Marri* judges may have been specific to context of lawfully present non-citizens apprehended in United States).

[191]

Moreover, even the executive branch's embrace of the "substantial support" standard prior to Section 1021's passage had appeared cautious, at best. As noted above, it is not apparent whether this administration ever has detained an individual solely as a substantial supporter. It appears nearly exclusively to have relied on a "part of" theory to justify its detentions, and it specifically has foresworn reliance on support in at least two cases.

Nevertheless, plaintiffs bear the burden of establishing standing.[192] Whether Section 1021 can or will alter executive practice, particularly *with regard to individuals like them*, is purely a matter of speculation. The fact remains that—despite the executive at least nominally asserting the authority to detain on the basis of "support" since the 2004 CSRT enemy combatant definition, and on the basis of "substantial support" since the March 2009 Memo,[193] and despite the D.C. Circuit recognizing the lawfulness of detention at least on the basis of "purposeful and material support" since 2010—plaintiffs have provided no basis for believing that the government will place Jonsdottir and Wargalla in military detention for their supposed substantial support. In all the circumstances, plaintiffs have not shown a sufficient threat of enforcement to establish standing. Moreover, they cannot "manufacture standing" based on any present injuries incurred due to their expressed fears.[194]

Nothing in this decision should be confused as deference to the political branches because the case involves national security and foreign affairs. We adhere to the principle that courts have a vigorous and meaningful role to play in assessing the propriety of military detention, as the Supreme Court has made clear in cases from *Hamdi* to *Boumediene*.[195] We hold only that a

---

[192]

*See Clapper*, 133 S. Ct. at 1149 n.4 ("[I]t is [plaintiffs'] burden to prove their standing by pointing to specific facts, not the Government's burden to disprove standing by revealing details of its surveillance priorities." (citation omitted)).

[193]

While the March 2009 Memo was, on its face, specific to authority to detain those then held at Guantánamo, there is nothing in the record to suggest that the government had any different view of its authority outside of Guantánamo.

[194]

*Clapper*, 133 S. Ct. at 1151.

[195]

*See Hamdi*, 542 U.S. at 532 ("It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that

court first must satisfy itself that the case comports with the "irreducible constitutional minimum" of Article III standing.[196] This inquiry is rooted in fundamental separation-of-powers principles and must be "especially rigorous" where, as here, the merits of the dispute require the court to "decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."[197] Section 1021 is concerned entirely with the military authority of the President with respect to non-citizens abroad—a context in which Congress provides the President broad authority to exercise with considerable discretion. Particularly after *Clapper*, plaintiffs must show more than that they fall within the ambit of this authority to establish the sufficient threat of enforcement necessary for Article III standing. They have failed to do so here.

A final note: Plaintiffs repeatedly refer to the First Amendment overbreadth doctrine as if it were relevant to whether they have established Article III standing. It is not. Relaxing the general prudential rule against third-party standing, the overbreadth doctrine permits a plaintiff to represent the legal interests of parties not before the court when seeking facial invalidation of a statute under the First Amendment, if certain conditions are met.[198] Critically, "[w]e allow a party to bring an overbreadth challenge where that party 'satisfies the Article III requirement of "injury-in-

we must preserve our commitment at home to the principles for which we fight abroad."); *Boumediene*, 553 U.S. at 798 ("The laws and Constitution are designed to survive, and remain in force, in extraordinary times. Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law.").

[196]

*Lujan*, 504 U.S. at 560.

[197]

*Clapper*, 133 S. Ct. at 1147 (internal quotation marks omitted).

[198]

*Farrell v. Burke*, 449 F.3d 470, 494–95 (2d Cir. 2006) (Sotomayor, J.); *see Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003); *Broadrick v. Oklahoma*, 413 U.S. 601, 612–15 (1973).

fact" and where it can be expected satisfactorily to frame the issues in the case.'"[199] In other words, the overbreadth doctrine speaks to whose interests a plaintiff suffering Article III injury may represent. It does not provide a reason to find such injury where none is present or imminently threatened in the first instance.

*III.    Conclusion*

In sum, Hedges and O'Brien do not have Article III standing to challenge the statute because Section 1021 simply says nothing about the government's authority to detain citizens. While Section 1021 does have meaningful effect regarding the authority to detain individuals who are not citizens or lawful resident aliens and are apprehended abroad, Jonsdottir and Wargalla have not established standing on this record. We VACATE the permanent injunction and REMAND for further proceedings consistent with this opinion.

---

[199] *Farrell*, 449 F.3d at 499 (quoting *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984)) (alterations omitted).