**Cayuga NATION and John Does 1–20, Plaintiffs,**

v.

**Howard TANNER, Village of Union Springs Code Enforcement Officer, in his Official Capacity; Edward Trufant, Village of Union Springs Mayor, in his Official Capacity; Chad Hayden, Village of Union Springs Attorney, in his Official Capacity; Board of Trustees of the Village of Union Springs, New York; and Village of Union Springs, New York, Defendants.**

**No. 5:14–CV–1317.**

United States District Court, N.D. New York.

Signed June 11, 2015.

David DeBruin, Esq., Joshua M. Segal, Esq., Matthew E. Price, Esq., John G. Powers, Esq., Nina I. Brown, Esq., Hancock, Estabrook Law Firm, Syracuse, NY, for Plaintiffs.

Chad R. Hayden, Esq., Office of Chad R. Hayden, Henrietta, NY, Cornelius D. Murray, Esq., O'Connell, Aronowitz Law Firm, Albany, NY, for Defendants.

### MEMORANDUM–DECISION and ORDER

DAVID N. HURD, District Judge.

## I. INTRODUCTION

This latest pair of motions are another chapter in the long-running dispute between plaintiff Cayuga Nation (the "Nation") and defendant Village of Union Springs (the "Village" or "Union Springs") over Lakeside Entertainment, a Nation-controlled gaming facility located in Union Springs.

The Nation, along with John Does 1–20 (the "Does"), recently filed suit against the Village and a laundry list of its officials claiming the federal Indian Gaming Regulatory Act ("IGRA") pre-empted the Village from enforcing its local anti-gambling laws against the Nation and its establishment. The Nation moved for a preliminary injunction and the Village cross-moved to dismiss the complaint. A temporary restraining order was entered in the interim.

On May 19, 2015, a Memorandum–Decision and Order issued granting the Village's cross-motion to dismiss—the Nation, embroiled in an internal dispute over its leadership, was unable to establish standing to bring the pre-emption suit; the unnamed Does, alleging only vague possibilities of possible future harm to their persons, were unable to demonstrate imminent injury. *Cayuga Nation v. Tanner*, 2015 WL 2381301 (N.D.N.Y. May 19, 2015) (the "*May 19 Decision*"). The temporary restraining order was vacated and this case was closed.

Two emergency motions were filed the very next day. First, the Does moved for reconsideration of the *May 19 Decision* to the extent it dismissed them from the suit. Second, the Nation, which has appealed, moved for a preliminary injunction pending the outcome of its appeal. Orders to show cause issued and a second temporary restraining order was entered. The motions were fully briefed and oral argument was heard on June 4, 2015 in Utica, New York. Decision was reserved.

## II. DISCUSSION [1]

### A. Motion for Reconsideration

The Does seek reconsideration of the *May 19 Decision's* sua sponte dismissal for

[1] A thorough discussion of the relevant factual background is available in the *May 19* *Decision* and will not be repeated here.

lack of standing and entry of judgment dismissing the complaint. They request leave to file an amended complaint identifying Does 1–3 as Clint Halftown ("Halftown"), Timothy Twoguns ("Twoguns") and Gary Wheeler ("Wheeler") and ask for restoration of the temporary restraining order pending a resolution of the merits of their original request for a preliminary injunction.

■ "The filing of an amended complaint is not permissible once a judgment is entered unless the judgment is set aside or vacated pursuant to Rule 59 of the Federal Rules of Civil Procedure." *In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 120 (2d Cir.2010) (citing *Nat'l Petrochemical Co. v. M/T Stolt Sheaf*, 930 F.2d 240, 244 (2d Cir.1991)). "Generally, district courts will only amend or alter a judgment pursuant to Rule 59 to correct a clear error of law or prevent manifest injustice." *Id.* (citation and internal quotation marks omitted).

The Does, citing the *May 19 Decision*, note that the Village did not initially contest their standing to sue and therefore they had no reason to identify themselves or otherwise elaborate on their standing to bring suit at that time.[2] Rather, they claim to have initially proceeded under a pseudonym to avoid being subjected to criminal or civil penalties from the Village. They again allege standing based on the Village's threatened enforcement activity and argue that they, as officers, employees, and/or representatives of the Nation involved in Lakeside Entertainment's gaming activities, would be directly subjected to those penalties.

■ "Whether a claimant has standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526 (2d Cir.1999) (citations and internal quotation marks omitted). This "irreducible constitutional minimum" requires an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l, USA*, —— U.S. ——, 133 S.Ct. 1138, 1146, 185 L.Ed.2d 264 (2013) (citations omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Id.* In other words, "[a]llegations of *possible* future injury are not sufficient." *Id.* (citations and internal quotation marks omitted).

The Does argue they "had every reason to believe that they personally were, and remain, at risk of civil or even criminal liability in connection with their role in facilitating the Nation's gaming activities." Pl.'s Mem., ECF No. 52–1, 5.[3] The Does support this claim of imminent injury by pointing out that attached to the Complaint are multiple instances of an "Order to Remedy Violations" issued by Union Springs as well as Village Code Enforcement Officer Tanner's March 24, 2014 letter addressed personally to Mrs. B.J. Radford. *See* Compl., Exs. C, F, & G, ECF No. 1, 27–29, 40–45.

■ As an initial matter, the Does seem to have glossed over at least one detail of these claims—Mrs. Radford, presumably one of the imminently threatened but as-yet-unidentified Does, no longer appears to

---

**2.** The issue of standing implicates a district court's subject matter jurisdiction and can therefore be raised sua sponte. *See, e.g., Cent. States Se. & Sw. Areas Health & Welfare Fund*

*v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir.2005).

**3.** Pagination corresponds with that assigned by CM/ECF.

be involved in the gaming facility's operation. Pl.'s Mem. at 5 (noting letter "addressed personally to B.J. Radford, *then* a Nation employee, was a strong indication that the Village would pursue legal action against the officers and employees of the Nation, and not only against the Nation itself" (emphasis added)). More relevant to this analysis, however, is the fact that this particular letter does not actually threaten any civil or criminal action; rather, Officer Tanner's letter to Mrs. Radford simply indicates he would be unable to grant a certificate of occupancy to Lakeside Entertainment until the ongoing zoning issues were resolved.

■ Of course, "a credible threat of prosecution" can act to excuse the sort of pre-enforcement bar to standing that often exists, since a plaintiff "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). However, a second review of the "Order to Remedy Violations" notices supplied by the Does confirms that each, which identifies various civil zoning issues, has been addressed to the "Cayuga Nation" of New York, not any of the Does themselves.

Further, the allegations in the complaint that might explain how the Does have been personally threatened with criminal proceedings are nothing more than general speculation. *See, e.g.,* Compl. ¶ 53 (noting the Village "intends to proceed with enforcement action" against the gaming facility). And the Proposed Amended Complaint would do little to rehabilitate this deficiency. *See* Powers Decl. Ex. B, ECF No. 52–4, ¶¶ 57–58 (additionally alleging the Village served Orders to Show Cause "directed at the Lakeside Entertainment facility" one day after issuance of the *May 19 Decision* ).

In fact, the strongest argument to support a claim that the Does themselves are under any credible threat of criminal enforcement is the Village's original anti-gaming resolution, enacted in 1958, that makes a "willful violation of any provision" of the ordinance "punishable as a misdemeanor." But even then, this Village resolution would only begin to establish a credible threat of enforcement when viewed in conjunction with the complaint's allegation of a July 2013 resolution by the Village to enforce this provision against the Nation. Compl. ¶ 38 & Ex. B, ECF No. 1, 24.

"A government official's statement that a statute prohibits a type of conduct in the abstract—even where the official also states [his] intent to enforce the statutory prohibition against the public generally—is usually insufficient, without more, to establish that prosecution is imminent against a particular plaintiff." *Jones v. Schneiderman*, 101 F.Supp.3d 283, 291, 2015 WL 1454529, at *4 (S.D.N.Y. Mar. 31, 2015) (comparing cases); *see also Rincon Band of Mission Indians v. San Diego Cnty.*, 495 F.2d 1, 4 (9th Cir.1974), *cert. denied*, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974) (holding that government officials' statements to plaintiffs that gambling was impermissible on tribal land "under [a] county ordinance," and that "all the laws of the county would be enforce," failed to establish a sufficient "threat of prosecution" for standing purposes).

Therefore, at the very least, *Cayuga Nation's* conclusion—that vague assertions of possible future enforcement action directed against the Does in particular, as opposed to the Nation's Lakeside Entertainment facility generally, were an insufficient basis on which to confer standing—was not a clear error of law.[4] *See Hedges*

---

4. The Village also argues Halftown's purport- ed status as federal representative is not an

*v. Obama,* 724 F.3d 170, 195 (2d Cir.2013) ("The Supreme Court's jurisprudence regarding how imminent a threat must be in order to support standing, however, has been less than clear."). To be sure, the Village has done a fair amount of saber-rattling in its submissions during this case, but representations made in legal memoranda cannot confer standing. Accordingly, the Does' motion for reconsideration will be denied.[5]

## B. *Injunction Pending Appeal*

The Nation also seeks an injunction pending the outcome of its appeal. Federal Rule of Civil Procedure 62(c) provides that a court "may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights" during an appeal from a "final judgment that grants, dissolves, or denies an injunction." FED.R.CIV.P. 62(c).

■ A court considering entering such an injunction must consider whether: (1) the movant will suffer irreparably injury absent the stay; (2) a party will suffer substantial injury if a stay is issued; (3) the movant has demonstrated a substantial possibility, although less than a likelihood, of success on appeal; and (4) public interests may be affected. *LaRouche v. Kezer,* 20 F.3d 68, 72 (2d Cir.1994).

"As the standard makes clear, a grant of injunctive relief pending appeal does not depend solely or even primarily on a consideration of the merits." *LaRouche,* 20 F.3d at 72. Indeed, "the degree to which [any one] factor must be present varies with the strength of the other factors, meaning that 'more of one [factor] excuses less of the other.'" *In re World Trade Ctr. Disaster Site Litig.,* 503 F.3d 167, 170

(2d Cir.2007) (quoting *Thapa v. Gonzales,* 460 F.3d 323, 334 (2d Cir.2006)). Accordingly, "the factors are viewed on a sliding scale, and [t]he necessary level or degree of possibility of success will vary according to the court's assessment of the other stay factors." *Seneca Nation v. Paterson,* No. 10–CV–687A, 2010 WL 4027795, at *1 (W.D.N.Y. Oct. 14, 2010) (citation and internal quotation marks omitted).

## 1. *Irreparable Harm*

The Nation argues permitting the Village to enforce its anti-gaming ordinance would result in irreparable harm to the Nation, whose citizens depend on the revenue stream generated by the gaming facility to provide essential community services. *See, e.g.,* Halftown Decl., ECF No. 5–8, ¶¶ 3, 12. The Village responds that any harm the Nation might suffer on that basis is self-inflicted, since such harm can be traced back to the Nation's "ill-advised decision to reopen the bingo hall eight years after this Court unequivocally held that the Nation could not assert immunity from the Village's laws and ordinances." Def.'s Mem., ECF No. 60, 16.

■ The Nation has the better part of this argument. An irreparable harm is a harm for which "a monetary award cannot be adequate." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). Ill-advised or not, the Nation credibly claims that not only would the Village's enforcement of its anti-gaming ordinance be an affront to its sovereignty, its citizens also depend heavily on the facility to provide funding for public services. Indeed, the irreparable harm requirement is generally satisfied where "enforcement

---

independent basis on which to find standing. The Does expressly disavow this claim in their reply memorandum. Does' Reply Mem, ECF No. 61, 7 ("The individual plaintiff have never argued anything like that").

5. This denial would not preclude plaintiffs from seeking to amend the complaint in the event *Cayuga Nation* is reinstated following the appeal.

of a statute or regulation threatens to infringe upon a tribe's right of sovereignty." *Seneca Nation*, 2010 WL 4027795, at *2 (collecting cases). And much like the tax law amendments at issue in *Seneca Nation*, "[t]he potential loss of an entire economy that currently supports many of each Nation's members and services is a harm that cannot be measured by monetary damages alone." *Id.* Accordingly, the threat of irreparable harm favors granting the Nation's motion.

## 2. *Substantial Injury to other Parties*

The Nation next argues the Village will not suffer any substantial injury if a stay were issued primarily because it has largely consented to maintaining the status quo—allowing the gaming facility to remain open—during the run up to, and course of, this litigation. The Village responds that the reopening of Lakeside Entertainment has given rise to violence necessitating police intervention, road closures, and hospitalizations. The Nation replies that the Village's own evidence indicates there has been no "unrest" on Cayuga lands since at least November 2014. George Decl., ECF No. 61–2, ¶¶ 12–13.

This factor also weighs in the Nation's favor. Although counsel for the Village lamented that "no good deed goes unpunished," the Nation and the Village appear to have had a relatively long-running "Standstill Agreement" before the Nation resorted to federal court to attempt to resolve the gaming issue. *See Seneca Nation*, 2010 WL 4027795, at *3 (concluding state defendant was unable to show substantial injury where it "voluntarily chose to forebear" enforcing the tax at issue "for many years" and concluding the "minimal, additional delay pending appeal" was insignificant when weighed against the potentially irreparable damage to the Seneca Nation's economy). The

same balance exists in this case, especially given the apparent lack of any ongoing hostilities. Accordingly, the Village has not demonstrated it would suffer substantial injury if an injunction were entered.

## 3. *Likelihood of Success*

The Nation asserts that the *May 19 Decision*, which simply "misunderstood the significance of certain language in the Bureau of Indian Affairs' ("BIA") February 20, 2015 decision," provides a troubling roadmap to success for any disgruntled tribal faction seeking to disable a tribe's access to federal court. Pl.'s Mem. at 12.

■ There is little doubt that courts "owe deference to the judgment of the Executive Branch as to who represents a tribe." *Timbisha Shoshone Tribe v. Salazar*, 678 F.3d 935, 938 (D.C.Cir.2012) (citation and explanatory parenthetical omitted). To that end, the Nation argues *Cayuga Nation* "asked the wrong question" when focusing on the BIA's statements about Halftown's authority being limited to administering certain pre-existing contracts, since the "BIA will not issue a recognition decision *except* when tied to [ ] a discrete request," such as resolving the issue of authority under a particular contract. Pl.'s Mem. at 12.

■ It is true that the BIA takes a decidedly circumspect approach to issues of tribal governance. This approach makes good sense, especially given that the Nation, a sovereign entity, retains the sole authority to actually resolve its internal leadership disputes. *See California Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1263 (D.C.Cir.2008) ("Since the days of John Marshall, it has been a bedrock principle of federal indian law that every tribe is capable of managing its own affairs and governing itself." (citation and internal quotation marks omitted)).

██ Indeed, "principles of tribal sovereignty and self-determination [ ] serve to constrain BIA's intrusion into internal tribal disputes, unless it is truly necessary as an incident to satisfying some separate Federal obligation." *Cayuga Indian Nation v. E. Reg'l Dir.*, 58 IBIA 171, 178 (Jan. 16, 2014). "[D]isfunctionality [*sic*] or even paralysis within a tribal government, standing alone, does not ... trigger some free-standing obligation for BIA to end the stalemate." *Id.* at 179. Simply put, "[i]f there is no separate need for Federal action during the Nation's tribal government dispute, BIA is not required to recognize anyone as the Nation's representation or any composition of the Council, nor would it be appropriate for BIA to do so." *Id.* at 181 n. 7.

The BIA's most recent correspondence indicates it has chosen to recognize the 2006 Council, the last undisputed tribal leadership, on an "interim" basis as part of its decision regarding how funding will be provided under certain community services contracts. *See* Poitra Letter, ECF No. 45–1, 2. But this letter also notes, consistent with the BIA's general principles of deference, that the Nation's ongoing leadership dispute is not an excuse for the BIA to "throw up its hands and conduct all government-to-government relations with the Nation 2006 Council indefinitely." *Id.* at 7. Indeed, the BIA expressly stated that it planned to "request a consensus resolution of the Nation 2006 Council before entering into subsequent contracts" with the Nation. *Id.*

This circumspect recognition language is the same stumbling block noted in *Cayuga Nation*. 2015 WL 2381301 at *4 n. 6 ("At this juncture, the BIA recognizes the Nation 2006 Council as the undisputed leader of the Cayuga Nation. Whether the Nation 2006 Council properly authorized this suit is an altogether separate matter."). Much as in *Salazar*, "[t]he fact is that we have a letter from the Executive Branch recognizing [a particular tribal faction], and we must not turn a blind eye to facts in assessing jurisdiction." 678 F.3d at 939.

But although this particular Executive Branch letter identifies the Nation 2006 Council as the appropriate leadership, it remains entirely unclear whether that body—with its requirement of unanimous consent as a prerequisite to Council action—authorized filing this lawsuit in the first place. *Cayuga Nation*, 2015 WL 2381301 at *4 ("As three members of the Nation 2006 Council support this lawsuit and three members oppose it, it is unclear whether the action has been properly authorized ....").

Likewise, despite the Nation's insistence to the contrary, the BIA's most recent letter also failed to articulate whether the scope of Halftown's status as federal representative covered unilaterally authorizing lawsuits, especially where three members of the 2006 Council actively oppose the suit and further dispute whether Halftown's authority to act on the Nation's behalf even includes filing such an action. *Accord George v. E. Reg'l Dir.*, 49 IBIA 164, 193 (May 4, 2009) (noting Halftown's role as "tribal representative to the Federal government .... is defined in the 2003 Designation Letter," but expressly disclaiming any decision on "the precise contours of the authority defined in that letter" or on "Halftown's authority beyond the scope of that letter"). Given these ongoing disputes between the 2006 Council members, the *May 19 Decision* concluded this action could not go forward.

Nevertheless, "[i]t remains an open question as to whether the Second Circuit will agree with [*Cayuga Nation's*] determination" and consequently "there is some possibility of success on appeal." *Seneca Nation*, 2010 WL 4027795, at * 3; *see also N. Mariana Islands v. Millard*, 287

F.R.D. 204, 215 (S.D.N.Y.2012) (noting argument had "sufficient force amidst admittedly murky concepts to eventually have a fair chance of success on the merits" and granting an injunction pending appeal). According, this factor weighs slightly in favor of granting the Nation's request.

### 4. *Public Interest*

Finally, the Nation argues that granting the injunction and preserving the status quo best furthers the public interest. The Village, for its part, argues the public interest is better served by authorizing it to enforce its local ordinances and zoning restrictions. Although the public certainly has an interest in the routine enforcement of valid laws, neither party's argument is particularly convincing. Given the apparent lack of any ongoing disruptions, the public interest will be best served by taking a cautious approach in this case. *See Seneca Nation,* 2010 WL 4027795, at *3 ("[T]he Court finds that granting a stay pending appeal is in the public interest because it will simply preserve the status quo ....."). Accordingly, this factor weighs slightly in favor of granting the Nation's request.

### 5. *Weighing the Factors*

 "To obtain a stay pending appeal, the movant need not always show a probability of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *Seneca Nation,* 2010 WL 4027795, at *2 (citation and internal quotation marks omitted). The Nation has done so here. Accordingly, the Nation's motion for an injunction pending appeal will be granted.[6]

### C. *Final matters*

"The court has discretion whether or not to require a successful applicant to post a bond to secure the appellee's interests pending appeal." *Exxon Corp. v. Esso Worker's Union, Inc.,* 963 F.Supp. 58, 60 (D.Mass.1997) (citing FED. R. CIV. P. 62(c)). Although "requiring the moving party to post a bond before granting a stay pending appeal may be the 'usual rule,'" it would be inappropriate here. *Safeco Ins. Co. of Am. v. M.E.S., Inc.,* 2010 WL 5437208, at *6 (E.D.N.Y. Dec. 17, 2010) (citation omitted).

In particular, the Village does not request the posting of a bond but rather seeks a condition of the injunction pending appeal that would result in disgorgement of the Nation's profits if the appeal is ultimately resolved in favor of the Village. *Frommert v. Conkright,* 639 F.Supp.2d 305, 313–14 (W.D.N.Y.2009) (declining to require bond where "plaintiffs do not raise any arguments about the appropriate size of the bond; they argue only that the motion for a stay should be denied outright"). However, the only issue to be resolved on appeal is that of the Nation's standing to bring its IGRA pre-emption claim, not a final adjudication of the merits of that argument. Notwithstanding the broad authority of a trial court to impose terms that work to "secure the opposing party's rights," the Village has not articu-

---

6. The Nation has represented it would not oppose a request by the Village to expedite the appeal. ECF No. 62. The Village responds by citing a recent empirical study of Second Circuit's Expedited Appeals Calendar and suggesting the term "expedited appeal" is a bit of a misnomer. ECF No. 63. However, the study itself notes that parties were often able to "return to the district court in a much shorter interval than would have elapsed in the absence of the [expedited calendar." *Id.* at 9. In any event, even mindful of the sometimes tortuous appeals process, the balance of factors here favor maintaining the current status quo.

lated a sufficient basis for such a drastic remedy and this request is declined.

Finally, the Village's request for sanctions against the Nation for this latest round of motion practice is also rejected. At the very least, the Nation cannot be faulted for thoroughly briefing the nuanced interplay between the BIA's circumspect treatment of the ongoing tribal leadership dispute and the constitutional requirements of standing.

## III. CONCLUSION

The Does' motion for reconsideration is denied. However, the Nation's motion for an injunction pending the outcome of its appeal of the *May 19 Decision* is granted.

Therefore, it is

ORDERED that

1. The Does' motion for reconsideration is DENIED;

2. The Nation's motion for an injunction pending appeal is GRANTED;

3. Pending the disposition of plaintiff Cayuga Nation's appeal, defendant Village, its agents, servants, and employees and any person acting in concert with them are enjoined from taking any steps to restrict, interfere with, punish, or otherwise penalize any actions taken by the Cayuga Nation, its officers, its employees, or its other representatives in furtherance of Class II gaming activities at Lakeside Entertainment, including but not limited to any effort to enforce the 1958 "Games of Chance" Ordinance or the Union Springs Zoning Ordinance or to penalize noncompliance with the Orders to Remedy that have been issued.

IT IS SO ORDERED.